E.I. DuPONT de NEMOURS AND COM-
PANY, a Delaware Corporation, and
David A. Pensak, Defendants Below, Ap-
pellants/Cross–Appellees,

v.

Norman J. PRESSMAN, Plaintiff Below,
Appellee/Cross–Appellant.

No. 35, 1995.

Supreme Court of Delaware.

Submitted: Jan. 30, 1996.
Decided: May 2, 1996.
Revised: July 10, 1996.

Paul M. Lukoff (argued), of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington; Raymond Michael Ripple and Donna L. Goodman of E.I. DuPont de Nemours & Co., Wilmington, for appellants/cross-appellees.

Gary W. Aber of Heiman, Aber & Goldlust, Wilmington, for appellee/cross-appellant.

Sheldon N. Sandler and Bhavana Sontakay Boggs of Young, Conaway, Stargatt & Taylor, Wilmington, for Delaware State Chamber of Commerce and various corporations, amicus curiae.

Before VEASEY, C.J., WALSH, HOLLAND, BERGER, JJ., and ALLEN, Chancellor,[1] constituting the Court en Banc.

VEASEY, Chief Justice:

In this appeal, we consider the scope of the employment-at-will doctrine (the "Doctrine") and the correlative application of the implied duty or covenant of good faith and fair dealing (the "Covenant") as a limitation on the Doctrine. We conclude that the scope of the Doctrine is broad. The Covenant is applicable here, but its scope is narrower than that articulated by the trial court. We reverse the judgment of the Superior Court on the ground that the jury instructions erroneously overstated the Covenant, and we direct that a new trial be ordered consistent with this Opinion.

The Doctrine generally permits the dismissal of employees without cause and regardless of motive. Nevertheless, we hold that the Covenant permits a cause of action against an employer for the deceitful acts of its agent in manufacturing materially false grounds to cause an employee's dismissal.

---

1. Sitting by designation pursuant to Del. Const., art. IV, § 12, and Supr.Ct.R. 2.

Our holding here reinforces and reaffirms the breadth of the Doctrine and the narrow and carefully crafted nature of the Covenant.

We also hold that punitive damages and damages for emotional distress are not available to remedy the breach of an employment contract absent possible circumstances not present here. Additionally, we hold that the Superior Court did not abuse its discretion in ruling on certain evidentiary matters raised by both parties. Accordingly, we **AFFIRM IN PART; REVERSE IN PART;** and **RE- MAND** with instructions to order a new trial consistent with this Opinion.

## I. Procedural Posture

E.I. DuPont de Nemours and Company ("DuPont"), defendant below, appeals from a judgment entered upon a jury verdict in favor of Norman J. Pressman ("Pressman").[2] The jury verdict for Pressman, which was based on his claim that DuPont breached the Covenant, awarded Pressman $422,700 in compensatory damages for lost wages. The jury also awarded Pressman $25,000 for emotional distress and interest, and $75,000 in punitive damages on the breach of the Covenant claim.

The jury rendered a verdict for DuPont on a claim for breach of an implied-in-fact contract requiring good cause for a termination of employment and for David Pensak ("Pensak"), Pressman's former supervisor, on a claim for defamation. Claims against DuPont for defamation and negligent evaluation were dismissed prior to trial.[3]

With respect to the Covenant, the Superior Court instructed the jury as follows:

[U]nder Delaware law, DuPont owed plaintiff a duty of good faith and fair dealing. Plaintiff contends that DuPont breached this duty. *The duty of good faith and fair dealing is breached by [an] employer if it discharges an employee maliciously, that's as a result of hatred, ill will or intent to injure, or effects the discharge in bad faith, that is through acts of fraud, deceit or intentional misrepresentation.*

What constitutes malice or bad faith depends on the intent of the persons effectuating the termination. One acts intentionally to cause a certain result. One acts maliciously if actions are [a result of] ill will or intent to injure.

Bad faith implies the conscious doing of wrong because of dishonest purpose. It is not simply bad judgment or negligence. It contemplates a state of mind affirmatively operating with a furtive design or ill will.

If you believe that by a preponderance of the evidence that Pensak or any other employee acted maliciously or in bad faith in terminating the plaintiff from his employment at DuPont, then you should find that DuPont violated its duty of good faith and fair dealing to Norman Pressman. If, however, Norman Pressman was terminated without malice or bad faith, or terminated for legitimate business reasons, then your verdict must be for the defendants.

(Emphasis supplied.) The jurors were also instructed that they could award punitive damages and damages for emotional distress if they found a breach of the duty of good faith and fair dealing. We find that the trial court's instructions to the jury erroneously overstated the Covenant and the allowable bases for awarding damages.

## II. Facts

We view the evidence in the light most favorable to Pressman. Pressman presented evidence that his immediate supervisor, Pensak, engaged in a retaliatory campaign to persuade Pensak's superiors that Pressman should be fired. The campaign began after Pressman confronted Pensak with evidence that Pensak may have had a conflict of interest. DuPont presented evidence that Pressman was hired as a high level scientist and simply failed to meet the high expectations inherent in the position. The jury apparently credited Pressman's version of events and did not credit DuPont's.

Pressman, a Ph.D. graduate of the University of Pennsylvania in Biomedical Engineer-

2. The plaintiff below also cross-appeals a decision by the Superior Court to exclude certain testimony.

3. Plaintiff does not cross-appeal the determinations in favor of DuPont.

ing, was hired away by DuPont from the Johns Hopkins School of Medicine in December 1986. DuPont sought Pressman's skills to develop the company's medical imaging technology. From the time he began work in early 1987 until April 1988, Pressman worked at various projects, receiving raises and positive evaluations from his superiors, including Pensak.

In January 1988, Pressman met with Pensak to discuss a possible conflict of interest created by Pensak's involvement as a technical advisor with a medical imaging technology company, Genesis. Pensak was paid $2,000 by Genesis to provide the company with information about and evaluations of new imaging technologies and to assist the company in identifying new business opportunities. Pressman raised his concerns with Pensak after Pensak arranged for representatives of Genesis to meet with Pressman about Genesis equipment and Pressman's knowledge of medical imaging technology.

When Pressman expressed his concerns about Pensak's relationship with Genesis, Pensak became livid and told Pressman to mind his own business. Shortly thereafter, on January 26, 1988, Pensak ordered Pressman "grounded." As a result, Pressman was not allowed to "travel off site ... even to other DuPont locations." Pensak also told Pressman that he could have "no visitors without my [Pensak's] permission." In the first half of 1988, Pensak also began to express to Charles Ginnard, the personnel representative for Pressman's division, purported concerns regarding Pressman's performance. Pensak placed an "anonymous unsigned" negative evaluation in Pressman's file. Pressman's performance rating was lowered to satisfactory in October 1988. In February 1989 his status was lowered to marginal. He was informed by Pensak of his termination on April 12, 1989. He left DuPont in June 1989.

Evidence was admitted at trial from which a rational jury could conclude that Pensak: (1) misrepresented Pressman's responsibilities to superiors so that it would appear that Pressman was not completing assigned tasks; (2) edited a progress report to superiors which would have had the effect of understating Pressman's accomplishments; and (3) failed to pass along the progress report showing some of Pressman's significant accomplishments during the critical time period in which Pressman's termination was decided.

### III. Pressman's Procedural Argument

■ Pressman contends that DuPont has waived its right to challenge the jury verdict because it failed to present its arguments below. Supr.Ct.R. 8; *Jeffery v. Seven Seventeen Corp.*, Del.Supr., 461 A.2d 1009 (1983). Pressman also contends that DuPont's failure to object to the jury instructions and its submission of proposed jury instructions prevents it from challenging the judgment.[4]

---

**4.** Superior Court Civil Rule 51 ("Rule 51") provides that "[n]o party may assign as error the giving or the failure to give an instruction unless a party objects thereto ...." A party seeking to challenge, on appeal, jury instructions to which it *did not object* at trial usually *must* establish plain error. *Riggins v. Mauriello*, Del.Supr., 603 A.2d 827 (1992). Additionally, the separate doctrine of invited error "may preclude review of an obvious and prejudicial error in a jury instruction when the failure to object thereto otherwise may have been excused." Wright & Miller, 9A *Federal Practice and Procedure* § 2558 at 470 (1995); *accord Dashiell v. State*, Del.Supr., 154 A.2d 688, 690 (1959); *Robelen Piano Co. v. DiFonzo*, Del.Supr., 169 A.2d 240, 247 (1961). "Thus a party who requests an instruction cannot complain if the instruction, or one substantially like it, is given." Wright & Miller, § 2558 at 471.

An exception to the requirement of Rule 51 and the doctrine of invited error applies "if the party's position previously has been made clear to the trial judge and it is plain that a further objection would be unavailing." Wright & Miller, § 2553 at 411; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). DuPont's motions for summary judgment and directed verdict did not rest on evidentiary insufficiency. Rather, DuPont argued that the governing legal standard in Delaware simply did not allow a cause of action in these circumstances. Since DuPont's position with respect to the law did not prevail in the trial court, DuPont was left to craft proposed instructions which stated what it believed the trial judge thought the law to be. DuPont was presented with a new and evolving legal standard for the application of the duty of good faith and fair dealing to at-will employment. *See Praprotnik*, 485 U.S. at 119–22, 108 S.Ct. at 922–23. Accordingly, DuPont has preserved the issue for appeal purposes.

DuPont challenges the judgment below based on a view that the Covenant simply does not extend to the undisputed facts here. DuPont asserted this position in its motion for summary judgment which was denied by the trial court. Since the denial of a motion for summary judgment is interlocutory and there is no appeal as of right, DuPont continued to litigate the claims. Once the case was ready for submission to the jury, and after having moved unsuccessfully for a directed verdict, DuPont had no choice but to submit proposed jury instructions in conformity with prior rulings of the Superior Court. Therefore, DuPont's contention is not waived and is preserved on appeal. Thus, the Court reaches the merits.

## IV. Good Faith And Fair Dealing in At-Will Employment

▮ DuPont contends that the Covenant does not extend to the facts of this case.[5] It points to the central importance of the Doctrine which "provides a heavy presumption that a contract for employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite." *Merrill v. Crothall–American, Inc.*, Del.Supr., 606 A.2d 96, 102 (1992).[6] The Doctrine has a long history in Delaware[7] and the United States.[8] The Covenant, perhaps in less robust form and by a different name, also has a long history. *See Blish v. Thompson Automatic Arms Corp.*, Del.Supr., 64 A.2d 581 (1948); *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 118

N.E. 214 (1917); *Heney v. Sutro & Co.*, 28 Cal.App. 698, 153 P. 972 (1915).[9]

### A. *Merrill v. Crothall–American*

While at-will employment remains a "heavy presumption," this Court recognized the limited application of the Covenant to an at-will employment contract in *Merrill v. Crothall–American, Inc.*, Del.Supr., 606 A.2d 96 (1992). In so holding, this Court stated:

It has been said that "to constitute a breach of the implied covenant of good faith, the conduct of the employer must constitute 'an aspect of fraud, deceit or misrepresentation.'" We think this characterization of an employer's duty under the covenant is accurate. The lodestar here is candor. An employer acts in bad faith when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some material way to the contract. Such conduct constitutes "an aspect of fraud, deceit or misrepresentation."

*Id.* at 101 (citations omitted). Merrill produced evidence from which a rational jury could infer that he had been hired by Crothall when Crothall had the intention of replacing him as soon as it found a suitable replacement. Construing the facts in favor of Merrill, the non-movant, it appeared that Crothall allowed Merrill to believe that the job offer was for an indefinite duration when, at the very same time, Crothall was actively

---

5. DuPont also argues, as a separate issue, that it was entitled to summary judgment on the good faith claim. This issue is subsumed within the question of whether or not the evidence before the jury meets the requirements of a good faith claim as a matter of law. The summary judgment issue is moot since the application of the Covenant was properly a jury question.

6. The jury found against Pressman on a claim that his employment contract with DuPont required cause for termination. We begin our analysis, therefore, with an employment contract that does not speak to the duration of the contract.

7. *See, e.g., Greer v. Arlington Mills Mf'g. Co.*, Del.Super., 43 A. 609 (1899).

8. *See, e.g., Martin v. New York Life Ins. Co.*, 148 N.Y. 117, 42 N.E. 416 (1895).

9. As Judge Posner, writing for the Seventh Circuit, has stated:

The contractual duty of good faith is thus not some newfangled bit of welfare-state paternalism or ... the sediment of an altruistic strain in contract law, and we are therefore not surprised to find the essentials of the modern doctrine well established in nineteenth-century cases....

*Market St. Assoc. Ltd. Partnership v. Frey*, 7th Cir., 941 F.2d 588, 595 (1991) (citations omitted). Commentators trace its roots to Roman times. *See* Holmes, *A Contextual Study of Commercial Good Faith: Good Faith Disclosure in Contract Formation*, 39 U.Pitt.L.Rev. 381 (1978); J.F. O'Connor, *Good Faith in International Law* (1991).

pursuing Merrill's replacement. Merrill left his prior employment based on that understanding. Merrill's claim, therefore, survived a summary judgment motion. Thus, *Merrill* was essentially a case where the Covenant was predicated on fraud in the inducement.[10]

In *Merrill*, this Court carefully limited its holding by noting that "[a]n employer has wide latitude in deciding how it conducts its business including its employment undertakings, ..." *id.* at 101, and explicitly reserving decision with respect to "what constitutes justification for termination of an at-will employment contract," *id.* at 102. The Court stated further:

> Nothing said here is to be construed as limiting an employer's freedom to terminate an at-will employment contract for its own legitimate business reasons, or even highly subjective, reasons. Such a contract is still terminable by either party for any reason not motivated by bad faith.

*Id.* at 103.

### B. Recognized Exceptions to Employment At–Will

With respect to the termination of at-will employment, the Court in *Merrill* held that the duty of good faith "may be breached by termination in some circumstances ... or some other public policy implicated by such a termination...." *Id.* at 102. *Merrill* made clear the limited range of situations in which the duty may be breached, citing cases which illustrate the limitation.[11] These cases, taken together with the facts of *Merrill*, support the proposition that the Covenant limits at-will employment only in very narrowly defined categories.[12] *See Wagenseller v. Scottsdale Mem. Hosp.*, 147 Ariz. 370, 710 P.2d 1025, 1031 (1985) ("The trend has been

to modify the at-will rule by creating exceptions to its operation").

The Supreme Judicial Court of Massachusetts, in the well-known case of *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), held that a rational jury could find that the employer had breached the Covenant by terminating a commissioned salesman after he had secured a large sale but before he became entitled to the commission at closing, simply to avoid paying him the commission. In *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 479 A.2d 781, 788 (1984), the Supreme Court of Connecticut held that a plaintiff could survive summary judgment on his claim that the employer fired him in retaliation for refusing to sign an untrue statement, noting that breach of the Covenant "cannot be predicated simply upon the absence of good cause for a discharge."

In *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974), the New Hampshire Supreme Court held that an employer breached the Covenant when it terminated an employee for refusing the sexual demands of her employer. *Monge* has been cited to stand for a "public policy" exception to at-will employment. *Wagenseller*, 710 P.2d at 1032. The public policy exception, whether conceived of independently as a tort or as arising from the Covenant, generally requires a clear mandate of public policy. As Chancellor Allen has described this category:

> [E]mployees who seek protection from firing on the basis that their actions were protected by a public policy, must assert a public interest recognized by some legislative, administrative or judicial authority, and the employee must occupy a position

---

**10.** The Court described the facts as follows: "This case involves a claim that the employer deceptively induced the employee to enter into an employment contract. The termination of employment merely gave effect to the deception. The asserted bad faith is therefore more analogous to a charge of fraud in the inducement than one of wrongful discharge." *Id.* at 102.

**11.** Of course, an employee's status in certain respects may not be the basis for discharge under federal and state law. This case does not present allegations that DuPont violated any statute prohibiting discriminatory employment practices.

*See, e.g.,* 19 *Del.C.* § 710, *et seq.* (race, marital status, color, age, religion, sex or national origin); 19 *Del.C.* § 720, *et seq.* (Handicapped Persons Employment Protections Act). Such claims are within the jurisdiction of the Equal Employment Review Board. 19 *Del.C.* § 718.

**12.** Pressman cites only two states which effectively require cause for termination of at-will employment. *Stark v. Circle K Corp.*, 230 Mont. 468, 751 P.2d 162 (1988); *Luedtke v. Nabors Alaska Drilling Inc.*, Alaska Supr., 834 P.2d 1220 (1992).

with responsibility for that particular interest.

*Shearin v. E.F. Hutton Group, Inc.*, Del.Ch., 652 A.2d 578, 587–89 (1994) (lawyer employee fired for refusing to violate her ethical duties may have a cause of action).[13]

■　Pressman's claim cannot fit within the public policy category since he does not identify an explicit and recognizable public policy. He alleges that DuPont fired him in retaliation for questioning the propriety of Pensak's business practices. This fact, standing alone, does not rise to the level of a legally cognizable public policy exception. As one treatise states: "Employees who uncover and blow the whistle on questionable internal financial and business practices [absent illegality] have won no support from the courts." Holloway & Leech, *Employment Termination: Rights and Remedies* at 180, (2d ed. 1993) (citing cases).

Another category of exceptions to the Doctrine created by the Covenant is exemplified by *Merrill*. In these cases, the employer is liable for misrepresenting some important fact, most often the employer's present intentions, and the employee relies thereon either to accept a new position or remain in a present one. In *Shebar v. Sanyo Bus. Sys. Corp.*, 218 N.J.Super. 111, 526 A.2d 1144 (1987), *aff'd*, 111 N.J. 276, 544 A.2d 377 (1988), the defendant-employer convinced an executive not to resign in favor of a competitor's offer. Four months later, the executive was summarily fired. The court held that the executive stated a claim for fraud. *Id.*; *see also Wildes v. Pens Unlimited Co.*, Me. Supr., 389 A.2d 837 (1978) (claim stated for fraud where company hired employee from another job knowing that position would be eliminated within days). This category is not applicable to the facts of this case.

Another exception applies when an employer uses its "superior bargaining power [to] ... depriv[e] the employee of 'compensation that is clearly identifiable and is related to the employee's past service.' " *Magnan*, 479 A.2d at 788 (quoting *Cort v. Bristol–Myers Co.*, 385 Mass. 300, 431 N.E.2d 908, 910 (1982)); *see, e.g. Fortune v. National Cash Register*, 373 Mass. 96, 364 N.E.2d 1251 (1977); *Zimmer v. Wells Management Corp.*, S.D.N.Y., 348 F.Supp. 540 (1972); *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 778 P.2d 744 (1989). The Arizona Supreme Court has described this line of cases as protecting "an employee from a discharge based on an employer's desire to avoid the payment of benefits already earned by the employee, such as the sales commission in *Fortune....*" *Wagenseller*, 710 P.2d at 1040.[14] Pressman's claim also does not fall in this category. In its verdict for DuPont on the implied-in-fact contract claim, the jury necessarily found that Pressman did not have a promise of secure employment. He has not identified another benefit to which he was entitled, such as earned commissions.

## C.　The Narrow Application of the Covenant of Good Faith and Fair Dealing to the Facts of this Case

Courts have been reluctant to recognize a broad application of the Covenant out of a concern that the Covenant could thereby swallow the Doctrine and effectively end at-will employment. *Wagenseller*, 710 P.2d at 1040 ("adopt[ing] such a rule ... would tread perilously close to abolishing completely the at-will doctrine ..."); *Magnan*, 479 A.2d at 788 ("complexity of the multifarious employment relationships" counsels against broad covenant requiring cause for dismissal); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081 (1984); *see also*

**13.** *Accord Gaines v. Wilmington Trust Co.*, Del.Super., C.A. No. 90C–MR–135, 1991 WL 113613, Del Pesco, J. (June 3, 1991) (exceptions are "narrowly drawn" and "generally statutory"), *aff'd* 608 A.2d 727 (1991); *Wagenseller*, 710 P.2d at 1036 (refusing to participate in indecent behavior); *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980) (refusing to violate food safety regulations). The Superior Court has also permitted an exception to the at-will rule for public policy. *Henze v. Alloy Sur-*

*faces Co., Inc.*, Del.Super., C.A. No. 91C–06–20, 1992 WL 51861, Bifferato, J. (March 16, 1992) (refusing to commit crime); *Heller v. Dover Warehouse Market, Inc.*, Del.Super., 515 A.2d 178 (1986) (refusing to take polygraph).

**14.** One treatise describes *Wagenseller*, with the exception of one other case, as "the single-most influential employment case in the last decade." *Employment Termination* at 97.

Arthur Leonard, *A New Common Law of Employment Termination,* 66 N.C.L.Rev. 631, 656 (1988). The presumption of at-will employment is a fixture of American law, and continues to be followed in Delaware and in the vast majority of jurisdictions.

Although the Covenant is a generally acknowledged principle, its precise contours are not fixed. We begin with an analysis of various contexts where the concept of "good faith" is employed. Although both the Doctrine and the Covenant are products of decisional law and not statutory law, the Uniform Commercial Code ("UCC") is appropriate to consider by analogy. The UCC defines good faith as "honesty in fact in the conduct or transaction concerned," 6 *Del.C.* § 1–201(19), and "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade," 6 *Del.C.* § 2–103(1)(b). The *Restatement* comments:

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.

*Restatement (Second) of Contracts* § 205, cmt. a. (1979).[15] *See also* Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code,* 54 Va.L.Rev. 195, 201 (1968):

> [Good faith is] an excluder. It is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of heterogenous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of

bad faith actually or hypothetically excluded.

The Covenant is best understood as a way of "implying terms in the agreement." Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code,* 30 U.Chi.L.Rev. 666, 670 (1963). It is a way of "honoring the reasonable expectations created by the autonomous expressions of the contracting parties." *Tymshare, Inc. v. Covell,* D.C.Cir., 727 F.2d 1145, 1152 (1984); *accord Pierce v. International Ins. Co. of Ill.,* Del.Supr., 671 A.2d 1361, 1366 (1996).

One method of analyzing the Covenant is to ask what the parties likely would have done if they had considered the issue involved. *See Katz v. Oak Indus., Inc.,* Del. Ch., 508 A.2d 873, 880 (1986) ("[I]s it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter?"); *Market St. Assoc. Ltd. Partnership v. Frey,* 7th Cir., 941 F.2d 588, 595 (1991) (the Covenant "is a stab at approximating the terms the parties would have negotiated had they foreseen the circumstances that have given rise to their dispute"); *accord* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv.L.Rev. 369, 387 (1980); *but see* Lillard, *Fifty Jurisdictions in Search of a Standard: The Covenant of Good Faith and Fair Dealing in the Employment Context,* 57 Mo.L.Rev. 1233, 1241 (1992) (asserting that good faith and at-will employment are "incompatible").[16]

 The application of the Covenant here relates solely to an act or acts of the employer manifesting bad faith or unfair dealing achieved by deceit or misrepresentation in falsifying or manipulating a record to

---

15. Interestingly, the *Restatement* cites with approval *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977), which imposed a duty of good faith and fair dealing in the at-will employment context.

16. The concept of good faith is present in other areas of law. *See, e.g., Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* Del.Supr., 624 A.2d 1199, 1208 n. 16 (1993) (limited partnerships); *Simons v. Cogan,* Del.Ch., 542 A.2d 785, 787 (1987) (corporate bond indenture); *Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050, 1054–55 (1984) (tender offer); *Jedwab v. MGM Grand Hotels, Inc.,* Del.Ch., 509 A.2d 584, 596 (1986) (preferred stock preferences).

create fictitious grounds to terminate employment. Since an assurance of continued employment is antithetical to at-will employment, no legally cognizable harm arises solely from the termination itself. *See Wagenseller,* 710 P.2d at 1040. Here, the harm derives from Pensak's creation of false grounds and manufacturing a record in order to establish a fictitious basis for termination. The evidence viewed in the light most favorable to Pressman shows that Pensak set out on a campaign to discredit Pressman by creating fictitious negative information about Pressman's work and hiding positive information. Based on the distorted record he created, Pensak went to his superiors and caused Pressman to be terminated.

If the jury believed that Pensak did these acts, and did them intentionally, they amounted to a breach of the Covenant. But the trial court overstated the issue in its charge to the jury by permitting the jury to find in Pressman's favor if they found that DuPont discharged Pressman "maliciously, that is as a result of hatred, ill will *or* intent to injure, *or* effects the discharge in bad faith, that is through acts of fraud, deceit or intentional misrepresentation" (emphasis supplied).

■ Employment relationships are complex, ambiguous and, ultimately, personal. One commentator has described the peculiar features of employment:

> Employment agreements are intrinsically different from commercial contracts in many fundamental ways. Employment agreements create an ongoing personal relationship between employee and employer—or in larger companies, with the employer's managerial and supervisory agents—which transcends purely economic interests.

Leonard, 66 N.C.L.Rev. 631, 656 (1988). This aspect of employment relationships counsels caution about creating causes of action based solely on personal motivations. Employees and their supervisors work closely together and personality clashes have the potential to interfere seriously with the achievement of an organization's mission. Dislike, hatred or ill will, alone, cannot be the basis for a cause of action for termination of an at-will employment. The jury instruction here, which is expressed in the disjunctive, would permit a cause of action where an employee was discharged because of dislike, openly expressed. Here, if the jury believed that Pensak, not having authority unilaterally to fire Pressman, maliciously employed deceit and subterfuge to manufacture grounds for Pressman's dismissal at the hands of Pensak's superiors, Pensak went beyond the broad, permissible scope of the Doctrine and crossed into the limited zone of the Covenant. DuPont was made aware after the fact of this course of events and ratified Pensak's actions. Thus, DuPont can be held liable to Pressman on this claim based upon carefully limited instructions to the jury.

The precise problem with the trial court's instruction to the jury is that its disjunctive formulation did not tie the malice of Pensak toward Pressman to the intent to injure him by causing him to be terminated based on falsified grounds. The instruction would have permitted the jury, for example, to render a verdict for Pressman if they found he was terminated because Pensak "hated" him or harbored "ill will" toward him. The breadth of the jury charge therefore was inconsistent with the breadth of the Doctrine and the limited exception created by the Covenant.

## V. Availability of Damages for Emotional Distress and Punitive Damages

DuPont also challenges the award of damages in favor of Pressman for emotional distress and punitive damages. The jury was instructed that it could award emotional distress and punitive damages to Pressman if it found that "DuPont acted maliciously to terminate plaintiff's employment or breached its duty of good faith and fair dealing...." Although we reverse the judgment below, the interest of judicial economy suggests that we reach the question of emotional distress and punitive damages. The two measures of damages will be addressed separately.

### A. Damages for Emotional Distress

■ Damages for emotional distress are not available for breach of contract in the

absence of physical injury or intentional infliction of emotional distress. *Pierce v. International Ins. Co. of Ill.*, Del.Supr., 671 A.2d 1361, 1367 (1996); *Tackett v. State Farm Fire & Cas. Ins. Co.*, Del.Supr., 653 A.2d 254, 265 (1995). Pressman has not suffered physical injury, and he did not establish the elements of intentional infliction of emotional distress. The instruction with respect to emotional distress damages, therefore, was error.

## B. Punitive Damages for Breach of Contract

■ The question of punitive damages is more difficult. The nature of the conduct which gives rise to a breach of the Covenant in the context of at-will employment requires consideration of the broader question of punitive damages as a remedy for breach of contract.

■ Historically, damages for breach of contract have been limited to the non-breaching parties' expectation interest. *See Restatement (Second) of Contracts* § 347. Also, punitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort.[17] *Id.* § 355. *See also* Farnsworth, *Contracts* § 12.8 ("[N]o matter how reprehensible the breach, damages that are punitive, in the sense of being in excess of those required to compensate the injured party for lost expectation, are not ordinarily awarded for breach of contract) (citing *J.J. White, Inc. v. Metropolitan Merchandise Mart, Inc.*, Del.Super., 107 A.2d 892, 894 (1954)).[18] As the introductory note to the remedies portion of the *Restatement (Second) of Contracts* states:

> The traditional goal of the law of contract remedies has not been compulsion of the promisor to perform but compensation of

the promisee for the loss resulting from the breach. "Willful" breaches have not been distinguished from other breaches, punitive damages have not been awarded for breach of contract, and specific performance has not been granted where compensation in damages is an adequate substitute for the injured party.

The Uniform Commercial Code also adheres to the traditional view that expectation damages are the standard remedy for breach of contract. 6 *Del.C.* § 1–106. Although the UCC imposes a duty of good faith and fair dealing, 6 *Del.C.* § 1–201 & 2–103, punitive damages generally are not awarded for a breach of the Covenant.

> Unless the bad faith rises to the level of an independent tort, which itself would support an award of punitive damages, mere bad faith on the part of a party to a contract will not give rise to punitive damages.

Anderson, *Damages Under the Uniform Commercial Code* § 11:35 (1992 & Supp. 1995).

Traditional contract doctrine is also supported by the more recent theory of efficient breach. The theory holds that properly calculated expectation damages increase economic efficiency by giving "the other party an incentive to break the contract if, but only if, he gains enough from the breach that he can compensate the injured party for his losses and still retain some of the benefits from the breach." *Restatement (Second) of Contracts*, Reporter's Note to Introductory Note to ch. 16, Remedies; *see also* Barton, *The Economic Basis of Damages for Breach of Contract*, 1 J.Legal Studies 277 (1972). The notion of efficient breach "accords remarkably with the traditional assumptions of the law of contract remedies." Farnsworth,

---

17. We need not decide the availability of punitive damages in an action sounding in tort based on these facts. No claim based on a tort theory for malicious and fraudulent termination (assuming *arguendo* that there is such a tort) has been pleaded. Pressman pleaded a tort claim for defamation against Pensak, but the jury found against Pressman on this claim.

18. "The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else." Holmes,

*The Path of the Law*, 10 Harv.L.Rev. 457, 462 (1897). As Farnsworth has described the tradition: "Our system, then, is not directed at compulsion of promisors to prevent breach; rather, it is aimed at relief to promisees to redress breach." Farnsworth, *Legal Remedies for Breach of Contract*, 70 Colum.L.Rev. 1145, 1147 (1970). Such an approach "adds to the celebrated freedom to make contracts, a considerable freedom to breach them as well." *Id.*

*Contracts* § 12.3 at 155.[19] Punitive damages would increase the amount of damages in excess of the promisee's expectation interest and lead to inefficient results. *Id.* at 155–56.

The traditional rule has been subject to a number of limited but well recognized exceptions. Judge Friendly, writing for the Second Circuit, listed the following: breach of a contract to marry; failure of a public monopoly to discharge its obligations to the public; breach of a fiduciary duty; breach accompanied by fraudulent conduct; and bad faith refusal by an insurer to settle a claim. *Thyssen, Inc. v. S.S. Fortune Star*, 2d Cir., 777 F.2d 57, 63 (1985) (citing authorities).

This Court has permitted punitive damages in the insurance "bad faith" context. Most recently, *Pierce v. International Ins. Co. of Ill.*, Del.Supr., 671 A.2d 1361, 1367 (1996), held that: "[P]unitive damages may be available in the context of a contract action if the denial of coverage is wilful or malicious ... [and] when the bad faith actions of an insurer are taken with a reckless indifference or malice toward the plight of the injured employee [insured]...." Also, in *Tackett v. State Farm Fire & Cas. Ins. Co.*, Del.Supr., 653 A.2d 254, 265 (1995), this Court held that: "[A]n insured may be entitled to the recovery of punitive damages in a bad faith action if the insurer's breach is particularly egregious."

Whether to expand punitive damages beyond the traditional applications is a question that occurs frequently. Some commentators have argued for greater availability of punitive damages for breach of contract.[20] While these arguments have some force, we are reluctant to depart markedly from the well-established body of law.

The reasons for a cautious approach retain much force. The California Supreme Court described these concerns succinctly, stating:

[T]he employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies in view of the countervailing concerns about economic policy and stability, the traditional separation of tort and contract law, and finally, the numerous protections against improper terminations already afforded employees.

*Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 234–35, 765 P.2d 373, 396 (1988). Considerations of policy support this view. Parties would be more reluctant to join in contractual relationships, or would expend more effort explicitly defining such relationships, if they faced the prospect of damages which could be out of proportion to the amounts involved in the contract. Contracting is a bargained-for exchange. It is the primary mechanism for the allocation of goods, labor and other resources "in a socially desirable manner." *Restatement (Second) of Contracts*, Introductory Note to ch. 16. We recognize the need for caution in fashioning common-law remedies which might inhibit such activity. *See Harris v. Atlantic Richfield Co.*, 14 Cal.App.4th 70, 17 Cal. Rptr.2d 649, 653–654 (1993) (restrictions on contract remedies "promote contract formation by limiting liability to the value of the promise"); *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, Ind.Supr., 608 N.E.2d 975, 981 (1993) ("well-defined parameters ... lend a needed measure of stability and predictability").

In *Pierce* and *Tackett*, this Court has allowed punitive damages for bad faith breach of an insurance contract. This raises the question: Why should insurance contracts be treated differently from virtually all others? The California Supreme Court has relied upon the "special relationship" between insurer and insured to support such a distinction. The special relationship, according to

---

**19.** The theory of efficient breach is certainly not without its critics. *See* Farber, *Reassessing the Economic Efficiency of Compensatory Damages for Breach of Contract*, 66 Va.L.Rev. 1443 (1980); MacNeil, *Efficient Breach of Contract: Circles in the Sky*, 68 Va.L.Rev. 947 (1982); Friedmann, *The Efficient Breach Fallacy*, 18 J.Legal Studies 1 (1989).

**20.** *See, e.g.*, Farber, *Reassessing the Economic Efficiency of Compensatory Damages for Breach of Contract*, 66 Va.L.Rev. 1443 (1980); Sebert, *Punitive and Nonpecuniary Damages in Actions Based Upon Contract: Toward Achieving the Objective of Full Compensation*, 33 UCLA L.Rev. 1565 (1986).

the California Supreme Court, is characterized by: (1) the personal interests—as opposed to commercial interests—sought to be protected by insurance; (2) the public service nature of insurance; and (3) the adhesive nature and unbalanced bargaining position between insurer and insured. *Foley*, 765 P.2d at 390. Also, we have described the "essential benefits" of an insurance contract as "income security and a reduction in uncertainty." *Pierce*, 671 A.2d at 1366.

The California Court distinguished the employment relationship, stating:

> [I]n terms of abstract employment relationships as contrasted with abstract insurance relationships, there is less inherent relevant tension between the interests of employers and employees than exists between that of insurers and insureds. Thus the need to place disincentives on an employer's conduct in addition to those already imposed by the law simply does not rise to the same level as that created by the conflicting interests at stake in the insurance context.

*Foley*, 765 P.2d at 396.

Market forces will not allow an employer consistently to treat valued employees in such a shabby manner as that presented here. An employer has an incentive to retain and motivate employees to achieve its mission. Some will do this better than others, but all employers have an incentive to do it well. Corporations cannot allow their agents systematically to engage in ill treatment of employees, particularly in light of "the numerous protections against improper terminations already afforded employees." *Foley*, 765 P.2d at 396.

Insurance is different. Once an insured files a claim, the insurer has a strong incentive to conserve its financial resources balanced against the effect on its reputation of a "hard-ball" approach. Insurance contracts are also unique in another respect. Unlike other contracts, the insured has no ability to "cover" if the insurer refuses without justification to pay a claim. Insurance contracts are like many other contracts in that one party (the insured) renders performance first (by paying premiums) and then awaits the counter-performance in the event of a claim. Insurance is different, however, if the insurer breaches by refusing to render the counter-performance. In a typical contract, the non-breaching party can replace the performance of the breaching party by paying the then-prevailing market price for the counter-performance.[21] With insurance this is simply not possible.[22] This feature of insurance contracts distinguishes them from other contracts and justifies the availability of punitive damages for breach in limited circumstances.

Economic theory also provides some support for the distinction. The economic theory supporting the notion of efficient breach assumes a world without transaction costs. In some cases, particularly those involving relatively large proportionate transaction costs such as lawsuits involving small amounts, the theory may have less application. "Insurance is far from the market ideals of complete information and no transaction costs." Pennington, *Punitive Damages for Breach of Contract: A Core Sample From the Decisions of the Last Ten Years*, 42 Ark.L.Rev. 31, 54 (1989). The assumption of no transaction costs "is a particularly significant defect if the amount in controversy is small." Farnsworth, *Contracts* § 12.3 at 157. Punitive damages or other supercompensatory remedies may be appropriate where a party "exploits the inadequacies of purely compensatory remedies...." *Patton v. Mid–Continent Sys., Inc.*, 7th Cir., 841 F.2d 742, 751 (1988) (Posner, J.); *see also* Posner, *Economic Analysis of Law* 104–106 (3d ed.

---

**21.** For example, Buyer may have paid $1,000 for 1,000 widgets. If Seller breaches and refuses to deliver the widgets, Buyer can cover by buying 1,000 widgets from someone else. Buyer may pay more than $1,000, but the breaching party must pay Buyer's costs of cover. 6 *Del.C.* § 2–712. If cover is not possible, as in the case of a real estate sales contract, specific performance is available. *See Restatement (Second) of Contracts* § 360, cmt. e.; 6 *Del.C.* § 2–716.

**22.** Suppose, for instance, Insured has paid—to date—$1,000 in premiums on a $10,000 policy. If Insured suffers a covered injury but Insurer refuses in bad faith to pay, Insured cannot receive the benefit of the bargain for anything approximating Insured's out-of-pocket costs. If Insured could "cover" the $10,000 loss, Insured would have selected a $10,000 deductible.

1986); Kronman & Posner, *The Economics of Contract Law* (1979).

Accordingly, we hold that punitive damages are not available for any breach of the employment contract which may be found by the jury upon retrial of Pressman's claim.

## VI. Testimony Regarding the Significance of Pressman's Research Was Properly Admitted

■ Halle Krider, Ph.D., testified that Pressman's progress report indicated significant scientific accomplishments which could further protect the blood supply from the HIV virus. DuPont argues that this testimony was irrelevant and prejudicial. Since a new trial will be ordered, in the interests of judicial economy, we express our view that the trial court's exercise of its discretion to admit the evidence was not an abuse of that discretion.

The testimony was relevant to show that Pensak kept from line management an important and helpful report regarding Pressman. Pressman can claim that Pensak pursued a vindictive campaign of malicious retaliation, and Krider's testimony is relevant to explain the context and significance of Pensak's actions. Accordingly, the evidence is admissible as tending to support the claim of deceit or misrepresentation in manufacturing a false and unbalanced picture of Pressman's employment performance.

## VII. Testimony From Other DuPont Employees About Their Relationship With Pensak Was Properly Excluded

■ Pressman cross-appeals from a decision of the Superior Court to exclude the testimony of former co-workers regarding their fears of retaliation by Pensak. We review such a decision for abuse of discretion. *Tice v. State,* Del.Supr., 624 A.2d 399, 401 (1993).

Pressman sought to present the testimony of two former co-workers that Pensak had retaliated against other employees. The trial court determined that such testimony conflicted with D.R.E. 404(b) [23] since it would be used to show that Pensak acted in conformity with a certain character, and it was unduly prejudicial. In light of the state of the record, we find that the trial court did not abuse its discretion. The initial offer of proof provided by Pressman furnished an inadequate basis to admit the testimony. Pressman's counsel argued before the Superior Court that "other dismissals will be evidence of the *character* and nature of Doctor Pensak's managerial abilities" (emphasis supplied). Counsel stated, further, that the evidence "will be relevant to show … [Pensak's] *propensity* to do exactly what he did in this case" (emphasis supplied). The trial judge correctly noted that D.R.E. 404(b) prohibits precisely such evidence.

Pressman later asked the trial court to modify its ruling after DuPont's counsel asked Pressman why he did not directly inform Pensak's superiors of his significant scientific discoveries. While such a situation may warrant the introduction of uncharged misconduct evidence in order to explain or support a witness' testimony,[24] the trial court had before it here an earlier, explicit, attempt to introduce character and propensity evidence. In this context, the second decision to exclude the testimony was also not an abuse of discretion. We need not decide whether another or different basis for the offer of proof in a new trial of this matter would lead to a different result. Therefore, this holding is without prejudice, if a different basis for admitting the same evidence is advanced at a new trial.

## VIII. Conclusion

The doctrine of employment at-will is well established and serves important social and economic goals. A significant erosion of the

---

**23.** D.R.E. 404(b) provides:
 **(b) Other Crimes, Wrongs or Acts.** Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other pur- poses, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

**24.** *See Pennell v. State,* Del.Supr., 602 A.2d 48, 52–53 (1991).

Doctrine could produce unacceptable costs in employment relationships. An implied covenant or duty of good faith and fair dealing is also a longstanding fixture of the common law of contracts. These two concepts can coexist if careful attention is paid to the objectively reasonable expectations of the parties to a contract of employment at-will. Since indefinite employment is not part of the bargain in an employment contract that does not explicitly so provide, neither party can point to the duty of good faith and fair dealing to support a requirement of good cause for termination. As in many other contracts, the Covenant limits, in a manner consistent with the terms of the contract, the ability of the parties to an at-will contract to exercise the freedom to terminate. In view of the importance of the personal dynamics of employment relationships, dislike or hatred as the sole basis for termination does not violate the Covenant. But fraud, deceit and misrepresentation, either in the inducement or in intentionally fictionalizing in a material way the employee's performance to cause dismissal, may be actionable as a breach of the Covenant.

The judgment of the Superior Court·is **REVERSED** and **REMANDED** for proceedings consistent with this opinion. We **AFFIRM** the evidentiary rulings of the Superior Court.

ALLEN, Chancellor, concurring:

I concur in the decision of the Court to reverse the trial court's judgment on the basis that the jury instruction overstated the effect, under Delaware law, of an implied covenant of good faith in the context of an at-will employment contract. While my analysis of the effect of such an implied term in the context described by the evidence in this case is somewhat different than that of the Court's Opinion, *cf. Mailhiot v. Liberty Bank and Trust Co.*, 24 Mass.App.Ct. 525, 510 N.E.2d 773 (1987), I see nothing to be gained as a practical matter in my imposing an elaboration of that view on the record in the circumstances. I concur as well in the holding and admirable discussion of the unavaila-

bility of punitive damages in contract actions of this sort.