**SUPERIOR COURT**
**OF THE**
**STATE OF DELAWARE**

PAUL R. WALLACE
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0660

Submitted: May 6, 2025
Decided: August 4, 2025

Michele D. Allen, Esquire
ALLEN & ASSOCIATES
4250 Lancaster Pike, Suite 230
Wilmington, Delaware 19805

James D. Taylor, Jr., Esquire
Devan A. McCarrie, Esquire
SAUL EWING LLP
1201 N. Market Street, 23rd Floor
Wilmington, Delaware 19801

RE: *Raushan Rich v. University of Delaware*
C.A. No. N23C-07-078 PRW
Defendant's Motion for Summary Judgment

Dear Counsel:

This Letter Decision and Order resolves Defendant University of Delaware's

motion for summary judgment (D.I. 49). For the reasons explained now, that motion

is **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

Plaintiff Raushan Rich is a resident of New Castle County, Delaware, who at

all relevant times was an employee of Defendant University of Delaware.[1]

Defendant University of Delaware is a private, state-assisted institution of higher education in Delaware.[2]

## B. FACTUAL BACKGROUND

In 2012, the University of Delaware hired Mr. Rich to be a police officer in its police department ("UDPD").[3]  The Collective Bargaining Agreement ("CBA") between the University and UDPD governed his employment terms.[4]  Thereunder, the University had exclusive control over Mr. Rich's employment status.[5]  CBA Article III, Section 1 states:

> all managerial and administrative prerogatives and functions are retained and vested exclusively in the University, in accordance with its sole and exclusive judgment and discretion to . . . demote, reprimand, suspend, discharge or otherwise discipline employees (without diminishing any rights provided by state law) . . . .[6]

The CBA also had a general safety provision.[7]  Article XII, Section 1 says:

> The University agrees to make reasonable provisions for the safety and health of bargaining unit members pursuant of their University-

---

[1]   Complaint ("Compl.") ¶ 3 (D.I. 1).

[2]   Pl.'s Answering Br. Ex. A ("Rich Dep."), at 11 (D.I. 50).

[3]   Rich Dep. at 14.

[4]   *See* Def.'s Opening Br. Ex. G ("CBA") (D.I. 49).

[5]   *See* CBA art. III § 1.

[6]   *Id.*

[7]   *See* CBA art. XII § 1.

recognized professional responsibilities while conducting departmental business or in lawful performance of their duties.[8]

During his time with UDPD, Mr. Rich was promoted to Sergeant and had no disciplinary issues for the eight years prior to the incidents that bring about this dispute.[9]

Before the start of the 2020 fall semester, the University established COVID-19 protocols.[10] One such protocol was the creation of separate quarantine residence halls for students who either tested positive for or were exposed to COVID-19, which required the use of the University's transportation services to shuttle students to and from the quarantine residence halls as necessary.[11]

Late August of 2020, Mr. Rich was informed that the UDPD would be required to transport students to the quarantine residence halls until the transportation services employees completed their safety training.[12] Mr. Rich alleges that the UDPD had not received training on how to safely transport students, operate the transport vehicles, use the decontamination machine, or use personal

---

[8]  *Id.*

[9]  Rich Dep. at 19.

[10]  *See* Pl.'s Answering Br. Ex. F ("2020 Move-In Operations") (D.I. 50).

[11]  *Id.*; *see* Rich Dep. at 56.

[12]  *See* Rich Dep. at 56.

protective equipment.[13]

On numerous occasions, Mr. Rich shared his concerns about using UDPD officers to transfer students who had tested positive for or been exposed to COVID-19 with his direct ranking officer, Lieutenant Adrienne Thomas.[14] In Mr. Rich's view, that process unnecessarily exposed officers to health and safety risks for non-law enforcement purposes.[15] But even after relaying those concerns to another supervisor, the policy didn't change.[16]

Mr. Rich talked with his squad, and they all said that they were unwilling to conduct the transport even though they were directed to do so.[17] When Mr. Rich informed Lieutenant Thomas of his squad's position, Lieutenant Thomas ordered Mr. Rich to choose a squad member to conduct the transport or he would be disciplined.[18] Mr. Rich refused.[19] Later that same evening, Lieutenant Thomas

---

[13] Compl. ¶¶ 17-20; Rich Dep. at 25-30; *see* Pl.'s Answering Br. Ex. G ("Transport Keys Email") (D.I. 50).

[14] Rich Dep. at 58-60.

[15] *Id.* at 60.

[16] *Id.* at 62-64.

[17] Compl. ¶ 28; Rich Dep. at 70-74.

[18] Rich Dep. at 74-81.

[19] *See* Pl.'s Answering Br. Ex. L ("Ogden Dep."), at 32 (D.I. 50).

placed Mr. Rich on emergency administrative leave.[20]  The next day, Mr. Rich learned that he was the subject of an internal affairs investigation and had been charged with insubordination.[21]

A Criminal Justice Council ("CJC") hearing was scheduled to investigate the insubordination charge.[22]  Pending the CJC hearing, Mr. Rich continued to receive full salary and benefits.[23]  In December of 2020, the CJC substantiated the charge of insubordination against Mr. Rich and he was officially terminated in accordance with the University's disciplinary matrix.[24]

## C. PROCEDURAL POSTURE

Mr. Rich first filed an action in the United States District Court for the District of Delaware, alleging violations of the Delaware Whistleblowers' Protection Act ("DWPA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1983, and 42 U.S.C. § 1981.[25]  The University moved to dismiss.[26]  Subsequently, a federal

---

[20]  Rich Dep. at 85.

[21]  *See* Def.'s Opening Br. Ex. V ("IA Findings") (D.I. 49).

[22]  *See* IA Findings.

[23]  Compl. ¶ 35.

[24]  Rich Dep. at 93.

[25]  *See Rich v. Univ. of Del.*, 2023 WL 1471484, at *2 (D. Del. Feb. 2, 2023).

[26]  *See id.*

magistrate judge issued a report and recommendation suggesting dismissal of the federal claims and survival of the state law DWPA claim.[27]  A month later, a district court judge adopted the report, but declined to exercise supplemental jurisdiction over the state DWPA claim.[28]

In July of 2023, Mr. Rich initiated this action.[29]  Mr. Rich brings two claims: violation of the DWPA (Count I)[30] and breach of the implied covenant of good faith and fair dealing (Count II).[31]  The University immediately filed a motion to dismiss which was denied.[32]

Discovery now having occurred, the University has filed this motion for summary judgment.[33]

## II. PARTIES' CONTENTIONS

In its motion, the University contends that it is entitled to summary judgment because Mr. Rich's DWPA and good faith and fair dealing claims fail as a matter of

---

[27]  *Id.* at *7.

[28]  *Id.* at *1.

[29]  *See generally* Compl.

[30]  *Id.* ¶¶ 41-54.

[31]  *Id.* ¶¶ 55-78.

[32]  D.I. 4 and 10.

[33]  D.I. 49.

law.[34]  For the DWPA claim, the University alleges that Mr. Rich did not engage in any protected activity.[35]  Pointing to the statutory requirement that a reported violation must be of a "law, rule, or regulation," the University states that Mr. Rich has not identified a "violation" as defined in the DWPA.[36]  Instead, he simply felt that what was asked of him (and other UDPD officers) was then unsafe and outside the scope of his duties—not unlawful.[37]

For the good faith and fair dealing claim, the University claims that the implied covenant isn't applicable because the CBA addresses the contested issues.[38] The University states that employee termination as well as health and safety standards are expressly contemplated in the CBA.[39]  The University—relying on Article III of the CBA, which grants the University broad managerial rights, and Article XII, which governs health and safety—argues that the CBA's express terms preclude a claim of breach of an implied covenant here.[40]  And even if the covenant

---

[34]  Def.'s Opening Br. at 11-15 (D.I. 49).

[35]  *Id.*

[36]  *Id.* at 12.

[37]  Def.'s Reply Br. at 3 (D.I. 57).

[38]  Def.'s Opening Br. at 16-17.

[39]  *Id.*

[40]  *Id.*; *see* CBA art. III § 1 and art. XII § 1.

was applicable, the University states that the claim would still be preempted by the DWPA.[41]

Mr. Rich opposes the University's motion for summary judgment.[42] Mr. Rich says he's properly stated a DWPA claim that should be left to a jury to decide.[43] For the good faith and fair dealing claim, he argues that if the DWPA claim fails, then the covenant claim is valid because the CBA has a gap that the covenant needs to fill.[44]

## III. STANDARD OF REVIEW

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits" show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[45]

The movant bears the initial burden of proving its motion is supported by undisputed facts.[46] If the movant meets its burden, the non-movant must show there

---

[41] Def.'s Opening Br. 17-19.

[42] D.I. 50.

[43] Pl.'s Answering Br. at 9-17 (D.I. 50).

[44] *Id.* at 18.

[45] Del. Super. Ct. Civ. R. 56(c); *Options Clearing Corp. v. U.S. Specialty Ins. Co.*, 2021 WL 5577251, at *7 (Del. Super. Ct. Nov. 30, 2021).

[46] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

is a "genuine issue for trial."[47]   To determine whether a genuine issue exists, the Court construes the facts in the light most favorable to the non-movant.[48]

## IV. DISCUSSION

### A. THE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT ON COUNT I—THE DWPA CLAIM—IS GRANTED.

"The DWPA prohibits an employer from discharging or otherwise discriminating against an employee for reporting a 'violation' to the employer or to the employee's supervisor, which he/she 'knows or reasonably believes has occurred or is about to occur.'"[49]   The DWPA defines a "violation" as "an act or omission by an employer . . . that is . . . [m]aterially inconsistent with, and a serious deviation from, standards implemented pursuant to a law, rule, or regulation promulgated under the laws of this State . . . ."[50]

In turn, the elements of an actionable DWPA claim are as follows:  (1) the employee engaged in a protected whistleblowing activity; (2) the accused official knew of the protected activity; (3) the employee suffered an adverse employment

---

[47]   Del. Super. Ct. Civ. R. 56(e); *see also Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) ("If the facts permit reasonable persons to draw but one inference, the question is ripe for summary judgment.").

[48]   *Judah v. Del. Trust Co.*, 378 A.2d 624, 632 (Del. 1977).

[49]   *Chance v. Kraft Heinz Foods Co.*, 2018 WL 6655670, at *10 (Del. Super. Ct. Dec. 17, 2018).

[50]   DEL. CODE ANN. tit. 19, § 1702(6) (2020).

action, and; (4) there is a causal connection between the whistleblowing activity and the adverse action.[51] The employee has the burden of showing that the "primary basis" for the discharge was that the employee undertook a protected act.[52]

The first element—that Mr. Rich engaged in a protected whistleblowing activity—requires, at a minimum, that Mr. Rich was reporting something that he reasonably believed could be illegal or a serious deviation from the law.[53] But that wasn't so here. He did not believe that the request was illegal.[54] Instead, Mr. Rich

---

[51] *Addison v. E. Side Charter School of Wilmington, Inc.*, 2014 WL 4724895, at *3 (Del. Super. Ct. Sept. 19, 2014).

[52] *Steinhouser v. Univ. of Del.*, 2019 WL 2359444, at *2 (Del. Super. Ct. June 4, 2019).

[53] Section 1703 of the DWPA provides that:

> [a]n employer shall not discharge, threaten, or otherwise discriminate against an employee . . . [b]ecause the employee . . . reports or is about to report . . . verbally or in writing, a violation which the employee knows or reasonably believes has occurred or is about to occur[.]

DEL. CODE ANN. tit. 19, §§ 1703(1), (4) (2020). *See Hanzer v. Nat'l Mentor Healthcare, LLC*, 2014 WL 1390889, at *6 (D. Del. Apr. 10, 2014) (granting summary judgment because plaintiff failed to identify a violation of any statute, rule, regulation, or law upon which her DWPA claim could be based).

[54] Though he now claims to. Rich Dep. at 61:

> Q. Did you tell Sergeant McCloskey that you believed the instruction or directive was illegal?
>
> A. No.
>
> Q. Did you believe it to be?
>
> A. No.
>
> Q. Did you believe that the instruction or directive violated any law?
>
> A. No.

raised concerns that the University's request of its police officers demonstrated poor judgment, was generally unsafe, and asked for action outside the scope of his job.[55]

But now, and throughout this litigation, he vaguely alleges that the request and University's response "implicate[s] compliance with health and safety laws and regulations, including CDC guidelines and OSHA directives."[56] But he's done nothing more at this point to further specify the law, rule, or regulation that would have been violated by the University's protocol and its use of UDPD officers to carry it out.

At this point though, Mr. Rich's incantation of vague generalized safety

---

Q. How about any regulation?

A. At that time, no.

Q. You said "at that time." Do you now believe it violates a law?

A. Yes.

Q. What is that?

A. I know OSHA requires general safety, that employers have to keep employees safe through reasonable means.

[55] Rich Dep. at 60:

A. I told Sergeant McCloskey how this wasn't safe and this was outside of the scope of what we have normally done as police officers for the University of Delaware, and just general preparedness. And it was a general conversation and he said, "Yeah, I agree." And we were both legitimately concerned, but at a certain point he said, "Well, Adrienne said call her. She is the boss." So that conversation stopped and I left and called Adrienne immediately.

[56] Pl.'s Answering Br. at 11.

principles is just too insubstantial a foundation for a proper DWPA claim.[57]   The failure to cite to any specific law, rule or regulation, when paired with his statement that he didn't believe the University's request to be illegal at the time, dooms Mr. Rich's whistleblower count.

Given then-existing circumstances—a still unfolding and frightening pandemic that so many institutions and public service agencies were struggling to deal with—Mr. Rich was no doubt reasonably wary of the University's judgment and expressing sincere concern for himself and other UDPD police officers.  But given the record now developed, no reasonable fact finder could find that Mr. Rich was reporting something he knew or reasonably believed was about to occur and that was illegal.  So, his actions cannot be deemed protected activity.

Accordingly, the University's motion for summary judgment on the DWPA claim is **GRANTED**.

---

[57]   *See Chance*, 2018 WL 6655670, at \*11 ("While the DWPA allows for the possibility that the reporting employee may be uncertain, at the time he or she reports the conduct, of the specific law, rule, or regulation that has been violated, or even that there is a law, rule, or regulation applicable to the reported conduct, DWPA liability cannot be based upon reported conduct that does not ultimately turn out to be a violation . . . .").

B. **THE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT ON COUNT II—THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM—IS GRANTED.**

Mr. Rich's implied covenant of good faith and fair dealing claim rests solely upon the allegation that the University's request for officers to conduct COVID-19 transports was *unlawful*, so in turn he was terminated in violation of public policy. Based on that claim, the Court finds that no reasonable factfinder could conclude that Mr. Rich has a viable claim under the implied covenant of good faith and fair dealing.

### 1. There is no gap in the CBA that must be filled.

"In Delaware, the implied covenant of good faith and fair dealing attaches to every contract and requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.'"[58] To prove a breach of the implied covenant, the plaintiff must demonstrate: (1) a specific implied contractual obligation; (2) a breach of that obligation; and (3) resulting damage.[59]

The doctrine has limited application. "[I]t cannot be invoked where the

---

[58] *Data Centers, LLC v. 1743 Holdings LLC*, 2015 WL 9464503, at *6 (Del. Super. Ct. Oct. 27, 2015) (citing *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).

[59] *Balooshi v. GVP Glob. Corp.*, 2022 WL 576819, at *9 (Del. Super. Ct. Feb. 25, 2022), *aff'd*, 285 A.3d 839 (Del. 2022).

contract itself expressly covers the subject at issue."[60]  Instead, it may only be applied

if a contractual gap exists regarding the issue before the Court.[61]  And "[o]nly when

it is clear from the writing that the contracting parties would have agreed to proscribe

the act later complained of, had they thought to negotiate with respect to that matter

. . . ."[62]

Mr. Rich claims that "the CBA does not address this instance as to what occurs

when an officer is ordered to violate or go against clear public mandate of public

policy and failure to comply results in termination."[63]  While it is true that there is

no specific provision on that issue, there doesn't need to be one.  The CBA is not

required, nor can it be expected, to expressly address every possible scenario.  This

instance is covered by the broad safety provision read together with the grievance

procedure.

First, Article XII Section 1 of the CBA, governing "Safety and Health," states:

The University agrees to continue to make reasonable provisions for

---

[60]  *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 479 (Del. Ch.), *judgment entered*, (Del. Ch. 2022) (quoting *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009)).

[61]  *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 183 (Del. Ch.), *judgment entered*, (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015).

[62]  *Data Centers*, 2015 WL 9464503, at *7 (citing *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006)).

[63]  Pl.'s Answering Br. at 18.

> the safety and health of bargaining unit members in pursuant of their University-recognized professional responsibilities while conducting departmental business or in lawful performance of their duties.[64]

This covers the root of Mr. Rich's claim—that he was inadequately prepared to handle COVID-19 transports.[65] Transport tasks were departmental business because officers had a past practice of escorting students across campus when needed.[66] And any failure regarding the adequacy of health and safety training would be covered under the provision as a failure to make "reasonable provisions."

Second, if an issue is raised, the CBA's general grievance procedures in Article VI covers the procedure for reporting a violation of the CBA.[67] That would include any claim stemming from a lack of following the CBA's safety provision, such as here. So combined, those CBA provisions cover institution of the University's temporary COVID-student transport protocol.

---

[64] CBA art. XII § 1.

[65] The University provided training that Mr. Rich claims was inadequate. *See* Def.'s Opening Br. Ex. J ("COVID-19 exposure Information Sheet") (D.I. 49); *see also* Def.'s Opening Br. Ex. L ("Bloodborne Pathogen Training") (D.I. 49); *see also* Def.'s Opening Br. Ex. M ("Mask Fit Test Report") (D.I. 49).

Whether a reasonable factfinder would find that the University provided "reasonable provisions for the safety and health of bargaining unit members"—*i.e.*, a straightforward CBA breach claim—is a different question that's not before the Court.

[66] *See* Def.'s Opening Br. Ex. C ("University Police non-COVID Medical Transport Policy") (explaining that it was a duty of university officers to escort students across campus at night or for non-emergency medical transports prior to COVID-19) (D.I. 49).

[67] CBA art. VI.

**2. Mr. Rich's attempted resort to a *Pressman* public policy claim fails.**

Mr. Rich has not satisfied the requirements of a *Pressman* public policy claim.[68]

"A *Pressman* public policy claim requires that a 'clear mandate of public policy be threatened by the termination.'"[69] Under *Pressman*, "[a]n employee 'must assert a public interest recognized by some legislative, administrative or judicial authority, and the employee must occupy a position with responsibility for that particular interest.'"[70] In Delaware, this claim requires that the employee question the legality of the conduct, not solely the judgment or ethics of it.[71]

Here, no "clear mandate of public policy" has been implicated. Mr. Rich has failed to assert any specific legislative, administrative or judicial authority. His vague references to executive orders, OSHA, the CDC, and IACP regulations without citing to any specific order or regulation and how it was violated isn't enough. In fact, the Court cannot find that there was a "clear mandate of public

---

[68] *See E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 441-42 (Del. 1996).

[69] *Addison*, 2014 WL 4724895, at *6 (quoting *Jordan v. Town of Milton*, 2013 WL 105319, at *12 (D. Del. Jan. 3, 2013)).

[70] *Jordan*, 2013 WL 105319, at *12 (quoting *E.I. DuPont de Nemours & Co.*, 679 A.2d at 441-42).

[71] *Addison*, 2014 WL 4724895, at *6.

policy" against asking public safety officers to adjust the norm and take on additional roles during the COVID-19 outbreak.[72] The Court finds that there is no genuine issue as to any material fact; there has been no recognizable public policy presented to support Mr. Rich's claim.

Contrary to what is required for a *Pressman* claim, Mr. Rich's complaint is, again, a matter of his disagreement as to what was best or safe for himself and his fellow officers. More simply, his claim isn't grounded in vindication of some public policy or his belief that there was a violation of such policy; it is based on his difference of judgment and subjective belief that the University didn't properly prepare him for the novel transport duties and his perception of a lack of job-relatedness.[73] Because no clear mandate of public policy was or is being threatened by his termination, Mr. Rich hasn't met the exacting standard for a *Pressman* public policy claim.

Accordingly, the University's motion for summary judgment on his implied covenant claim is **GRANTED**.

---

[72] *E.g.*, *Evans v. Dart*, 2021 WL 2329372, at *2 (N.D. Ill. June 8, 2021) (explaining that, due to COVID-19, correctional officers "have been engaging in extensive decontamination, cleaning, and sanitizing activities (collectively, 'decontamination activities') at the beginning and end of their shifts. Such activities include 'washing and sanitizing their uniforms, sanitizing their persons, sanitizing and maintaining [PPE], and showering.'").

[73] Rich Dep. at 60.

## V. CONCLUSION

For the foregoing reasons, the University of Delaware's motion for summary judgment as to both remaining counts is **GRANTED.**

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge

cc: All Counsel via File and Serve