# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KURT M. ROTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SOTERA HEALTH COMPANY, a | ) | C.A. No. 2022-1192-LWW |
| Delaware corporation and SOTERA | ) | |
| HEALTH LLC (f/k/a Sterigenics | ) | |
| International, LLC), a Delaware limited | ) | |
| liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 8, 2025
Date Decided: March 26, 2026

John M. Seaman, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Matthew B. Goeller, K&L GATES LLP, Wilmington, Delaware; Ryan Q. Keech, K&L GATES LLP, Los Angeles, California; Carl Alan Roth, GORDON KEMPER ROTH LLP, Beverly Hills, California; *Counsel for Plaintiff*

John P. DiTomo, Lauren K. Neal, Alec F. Hoeschel, Jialu Zou, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants*

**WILL, Vice Chancellor**

Plaintiff Kurt Roth, a former senior executive at Sotera Health, voluntarily resigned in September 2022 under a contract that mandated the forfeiture of unvested equity. The governing agreements state that Roth's equity would vest only if Sotera's private equity sponsors—GTCR and Warburg Pincus—achieved a certain return on their investments (i.e., "Sponsor Inflows" exceeding "Sponsor Outflows" by 2.5x) before his departure. Now, he seeks to recover millions of dollars in unvested performance-based equity on two legal theories.

Roth first attempts to satisfy the vesting threshold by classifying two transactions as Sponsor Inflows: a $1.13 billion payout made in 2015 to a predecessor GTCR fund, and a $397 million margin loan taken out by Warburg in 2021. The plain text of the agreements and economic realities of the transactions preclude this conclusion. Because the 2.5x threshold was unmet when Roth resigned, he cannot prove a breach of contract.

Roth alternatively claims the defendants breached the implied covenant of good faith and fair dealing by artificially suppressing their returns—pursuing an IPO, capping a secondary offering, and abandoning a block trade—and by constructively terminating him. The trial record refutes this narrative. The timing and structure of Sotera's capital markets transactions were driven by macroeconomic conditions and business decisions, not a bad-faith conspiracy to thwart vesting. As

1

for constructive termination, Roth left of his own volition and contractually forfeited his unvested equity in doing so.

Finding no breach of contract or of the implied covenant of good faith and fair dealing, judgment is entered in favor of the defendants.

## I. BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

### A. GTCR's Initial Investment in Sotera

GTCR LLC is a Chicago-based private equity firm, which invests its clients' monies through various limited partnerships generally referred to as "funds."[2] In 2006, GTCR created Fund IX.[3]

In 2011, GTCR Fund IX indirectly acquired STHI Holdings, Inc. ("SHI"), the predecessor parent holding company to Sterigenics International, LLC

---

[1] *See* Pre-trial Stipulation and Order (Dkt. 269) ("PTO"). Trial occurred over three days, during which seven fact and three expert witnesses testified. The trial record contains 790 joint exhibits, including 20 deposition transcripts. Trial testimony is cited as "[Name] Tr." *See* July 7-9, 2025 Trial Trs. (Dkts. 280-82). Exhibits are cited by the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined, and pincites are to the joint exhibit pagination. *See* Joint Ex. List (Dkt. 249). If joint exhibit pagination is unavailable, pin cites are to the last four digits of Bates stamps (shown as '----'). Deposition transcripts are cited as "[Name] Dep." *See* Notice of Lodging of Dep. Trs. (Dkt. 268).

[2] *See* PTO ¶ 11; JX 2 at 9.

[3] JX 590 at 1.

("Sterigenics"), a provider of medical product sterilization and lab testing services.[4] To facilitate the transaction, GTCR formed STHI Holding Corp. to purchase all of SHI's outstanding shares for $434.7 million.[5] This newly created acquisition vehicle sat at the bottom of a chain of wholly-owned subsidiaries, positioned directly beneath STHI Intermediate Holding Corp.[6]

## B.    The Sale to Warburg

In May 2015, the New York-based private equity firm Warburg Pincus purchased a majority interest in Sterigenics from GTCR Fund IX.[7] To facilitate Sterigenics' recapitalization, a corporate holding structure was created with new investors at the top. Sterigenics-Nordion Topco Parent LLC ("Topco Parent LLC") was formed, along with two wholly owned subsidiaries: Sterigenics-Nordion Holdings Topco LLC ("Topco LLC") and Sterigenics-Nordion Holdings, LLC ("SNH LLC").[8] SNH LLC then entered into a recapitalization agreement with the parent holding company (STHI Parent Company, LLC, or the "Predecessor Parent") to purchase SHI's outstanding stock, integrating Sterigenics into the enterprise.[9]

---

[4] JX 2 at 9; Rahe Dep. at 39; Cunningham Dep. at 13 (acknowledging Fund IX's interest in the predecessor entity); Petras Tr. 147.

[5] PTO ¶ 13.

[6] JX 2 at 9.

[7] JX 21 ("Topco Parent LLC Agreement") 1 (Recitals).

[8] Topco Parent LLC Agreement 1; *see also* PTO ¶ 13.

[9] PTO ¶ 14; *see also* JX 3 at 7.

On May 15, 2015, a series of Warburg funds and a new series of GTCR funds (*i.e.*, the GTCR Fund XI complex) contributed approximately $792 million to Topco Parent in exchange for membership units in that entity.[10] The $792 million flowed downstream from Topco Parent LLC to Topco LLC, and then to SNH LLC.[11] Using those funds together with financing from JP Morgan, SNH LLC paid the Predecessor Parent approximately $1.13 billion to purchase SHI's outstanding stock.[12] As a result of this transaction, which closed on May 15, 2015, the Predecessor Parent divested itself of its interest in SHI.[13]

Also on May 15, Topco Parent and its members executed an Amended and Restated Limited Liability Company Operating Agreement of Sterigenics-Nordion Topco Parent, LLC (the "Topco Parent LLC Agreement").[14] The Topco Parent LLC Agreement governed the terms and benefits of each class of the entity's equity.[15]

## C.    Roth's Hiring and Class B Units

In late 2015, plaintiff Kurt M. Roth was approached by GTCR and Warburg, as well as Sterigenics' then-CEO Michael Mulhern, about a job opportunity at

---

[10] PTO ¶ 15; *see also* Topco Parent LLC Agreement 1 (Recitals).

[11] PTO ¶ 14.

[12] *Id.*

[13] *Id.* ¶ 16; *see also* Topco Parent LLC Agreement 1.

[14] PTO ¶15.

[15] *See infra* notes 24-27 and accompanying text.

4

Sterigenics.[16] Roth was, at the time, an investment banker at Baird.[17] He understood that his background would be useful to Sterigenics, which was looking to grow through a targeted acquisition strategy.[18]

On November 9, 2015, Roth signed an offer letter, accepting a position as Sterigenics' Senior Vice President of Corporate Development and Strategy.[19] On February 24, 2016, he signed a Senior Management Agreement, which stated that he was an at-will employee.[20]

Roth was awarded 4,512,393 Class B Units "in connection with [his] employment."[21] A February 16 grant notice explained that the units would be split into 75% B-1 Units (3,384,295) and 25% B-2 Units (1,128,098).[22] The B-1 and B-2 Units would "vest in accordance with the terms set forth in Section 3.02(d) of the [Topco Parent] LLC Agreement."[23]

---

[16] Roth Tr. 80.

[17] *Id.* at 5-6.

[18] *Id.* at 13-14.

[19] JX 26.

[20] JX 35 ("Senior Management Agreement") § 1(c).

[21] JX 34 at 1.

[22] *Id.* at 1-2.

[23] *Id.* at 2.

Under the Topco Parent LLC Agreement, B-1 Units were subject to time-based vesting and scheduled to vest five years after the grant date.[24] The B-2 Units, by contrast, were subject to performance-based vesting.[25] They would vest upon a "Sponsors Inflow Trigger Date," which required each of GTCR and Warburg (the "Sponsors") to receive cash "Sponsor Inflows" equal to at least 2.5 times their respective "Sponsor Outflows," along with a 20% internal rate of return (IRR).[26]

Roth was also granted 721,983 "sign-on" B-1 Units that would vest within 90 days of December 1, 2015, and 1,353,718 "Super B-2 Units" with a different vesting schedule.[27] As a condition to the grants, Roth signed a joinder to the Topco Parent LLC Agreement, making him a Class B member.[28]

Roth's equity package was unique and reflected negotiated alterations to the default vesting terms for portions of both his B-1 and B-2 Unit grants.[29] For

---

[24] Topco Parent LLC Agreement § 3.02(d)(i) (addressing "Time-Based Vesting").

[25] *Id.* § 3.02(d)(ii) (addressing "Performance Vesting").

[26] PTO ¶¶ 17-20; Topco Parent LLC Agreement 2, 11, 14.

[27] PTO ¶¶ 36, 41. Super B-2 Units do not vest until the Sponsors receive 4x their invested capital. *Id.* ¶¶ 40, 41.

[28] JX 34 at 1 ("You acknowledge that you have received and reviewed a copy of the LLC Agreement. You acknowledge your assent to all of the rights and obligations under the LLC Agreement as a Class B Member thereof and holder of Class B Units, and understand that the grants hereunder shall not be effective unless and until you execute and return to the Company the form of assent attached hereto as Exhibit A[.]"); *id.* at Exhibit A.

[29] Roth Tr. 97, 99.

example, he was the only employee who received Super B-2 Units.[30] He was advised by counsel before entering into the Senior Management Agreement and Topco Parent LLC Agreement.[31]

### D. Petras's Leadership of Sotera

In 2016, Sterigenics' Board of Directors (the "Board") voted to replace Mulhern with Michael Petras as CEO.[32] Petras's compensation differed from the rest of the management team. Petras did not hold any B-2 Units and lacked any personal stake in the B-2 vesting thresholds.[33]

In July 2016, about a month after starting as CEO, Petras learned about the sizeable number of Class B Units Roth had been awarded.[34] He also learned that Roth was "the only person" on the management team "with a different vesting schedule." "Everyone else . . . vest[ed] in accordance [with] the LLC agreement."[35]

In October 2016, Topco Parent LLC was converted into a Delaware limited partnership called Sotera Health Topco Parent, L.P. ("Topco Parent LP").[36] Topco

---

[30] *See* Klaben Dep. 311 (explaining that Roth "negotiated an extraordinary award that no one else in the [C]ompany had, which [they] referred to as super B-2s").

[31] Roth Tr. 84, 96.

[32] Mulhern Dep. 20.

[33] Petras Dep. 45.

[34] JX 45.

[35] *Id.*

[36] PTO ¶ 43.

Parent LP was governed by a limited partnership agreement, which was amended and restated several times.[37] It eventually came to be governed under an Amended and Restated Limited Partnership Agreement of Topco Parent LP dated June 30, 2020 (the "Topco Parent LP Agreement").[38] Like the Topco Parent LLC Agreement, the Topco Parent LP Agreement stated that "[a]ll outstanding Class B-2 Units held by a Management Limited Partner will vest as of the Sponsors Inflow Trigger Date, if any, subject in all cases to such Management Limited Partner's continued Services through the Sponsors Inflow Trigger Date."[39]

### E. Sotera's IPO

Under Petras's leadership, the company's financial performance was robust. Between the 2015 recapitalization and July 2020, the company's estimated enterprise value nearly tripled, growing from approximately $2.3 billion to $6.0 billion.[40] This growth prompted the Board to consider strategic alternatives to facilitate an exit or monetization event for the Sponsors.[41] It explored the sale of all

---

[37] *Id.* ¶ 44.

[38] *Id.* ¶ 45; JX 174 ("Topco Parent LP Agreement").

[39] Topco Parent LP Agreement § 3.02(c)(ii); *see* PTO ¶ 46.

[40] JX 227 at 7.

[41] *See* Cunningham Tr. 463; Chen Tr. 296; Klaben Tr. 824; JX 194; JX 234.

or part of the company, which could have triggered a vesting event for the B-2 Units.[42]

By the summer of 2020, in the wake of the COVID-19 pandemic, the Board concluded that an initial public offering (IPO) was the only viable path to eventual liquidity.[43] An IPO, however, would not create the Sponsor Inflows required to trigger B-2 Unit vesting.[44] The Board authorized an IPO of 46.6 million shares, with an underwriters' option to purchase up to another 6.99 million shares (a "greenshoe" option), for a proposed maximum aggregate offering price of $1,232,570,000 at $23 per share.[45] The timing, price, and size of the IPO were set based on the advice of JP Morgan, the Company's outside financial advisor.[46]

As the IPO approached, the Board discussed accelerating the vesting of B-2 Units.[47] The Company was not contractually obligated to accelerate vesting, which would be an uncommon step to take.[48] Petras was against it. He told directors James

---

[42] *See* JX 20 at 20; JX 172; JX 163.

[43] Cunningham Tr. 463.

[44] JX 197.

[45] JX 252 at 3, 18.

[46] Klaben Tr. 819, 823, 837; JX 234 at '2442; JX 238 at '2569; Cunningham Tr. 466; Neary Tr. 556.

[47] JX 199 at 2 (listing "[a]ccelerated vesting of unvested performance RSUs" as a discussion topic); JX 617.

[48] *See* Guay Tr. 893-94 (opining that accelerated vesting in an IPO could create management retention risks).

Neary (of Warburg) and Constantine Mihas (of GTCR) that he did not "want to create a retention issue."[49] In Petras's view, accelerating the awards before vesting conditions were met would eliminate their retention value at a time when the company needed leadership stability.[50] He explained that the company's public filings already stated the units would "be transitioned to [restricted stock units (RSUs)] upon [the] IPO."[51]

The Board ultimately decided not to accelerate vesting for the B-2 Units.[52] Instead, on the advice of an outside compensation consultant, the Board "put in place a series of new awards . . . to provide new value going forward from the IPO."[53] It adopted a 2020 Omnibus Incentive Plan, which set aside 27.9 million shares for future equity grants to align the management team with new public stockholders.[54] The Board also made the discretionary decision to use a portion of the IPO proceeds to repurchase vested pre-IPO equity from top executives, including Petras and Klaben.[55]

---

[49] JX 200.

[50] *Id.*

[51] *Id.*; *see* JX 196; Petras Tr. 183-84.

[52] JX 202 at 1. In keeping with this decision, executives who resigned before the IPO—such as former CFO Phil MacNabb—forfeited their unvested B-2 Units in accordance with their contracts. *See* Petras Tr. 188-89.

[53] Klaben Tr. 874-75 (discussing advice from the Board's compensation consultant).

[54] JX 252 at '0708 (2020 Incentive Plan).

[55] *See* Klaben Tr. 877-78.

10

In preparation for the IPO, a subsidiary of Topco Parent LP called Sotera Health Topco Inc. changed its name to Sotera Health Company ("Sotera").[56] Sotera closed its IPO on November 20, 2020, resulting in over $1 billion in proceeds.[57] Topco Parent LP was subsequently dissolved.[58] Topco Parent LP unit holders were advised that their Class B Units would be exchanged for an equivalent value of restricted shares of Sotera common stock, with each share valued at the IPO price.[59]

## F.  The Restricted Stock Agreement

Four days before the IPO, on November 16, Roth and other Sotera managers holding B-1 and B-2 Units were sent a Restricted Stock Agreement and Acknowledgment (the "Restricted Stock Agreement") and a Stockholders Agreement.[60] An email from Sotera's Chief Human Resources Officer Sally Turner explained that execution of the Restricted Stock Agreement was a condition to receiving shares of Sotera stock.[61] Class B Unit holders were told that "[i]f any units [they] currently [held] in Topco Parent [LP] [we]re subject to vesting conditions, the [Restricted Stock Agreement] provide[d] that generally the same vesting provisions

---

[56] PTO ¶ 47.

[57] *See* Klaben Dep. 236; PTO ¶ 48.

[58] PTO ¶ 49.

[59] *Id.* ¶ 50.

[60] JX 227.

[61] *Id.* at 1.

11

[would] apply to [Sotera] stock."[62]  The email also explained that the Stockholders Agreement included "terms from the partnership agreement that continue post IPO, including governance and transfer restrictions on unit holders."[63]

Limited partners were given little time to sign the documents, with no opportunity to negotiate the terms.[64]  Roth signed the Restricted Stock Agreement on November 19.[65]  He signed the Stockholders Agreement on the same day.[66]

### G.    The $30 Million Man

In connection with the IPO, Roth acquired vested equity worth over $24 million.[67]  He also retained a significant amount of unvested B-2 and Super B-2 Units.  By 2021, Sotera's internal calculations showed that the value of Roth's unvested equity had reached $17,374,644.[68]  Warburg referred to Roth as the "$30M+ man."[69]

For Petras, Roth's equity was a sore subject.  On February 11, 2021, he told Turner he was "still in shock over Kurt's equity value" and "probably ha[d] a mental

---

[62] *Id.*

[63] *Id.*

[64] Turner Dep. 190, 201-03.

[65] PTO ¶ 52; JX 244 ("Restricted Stock Agreement").

[66] PTO ¶ 52; JX 242 (Stockholder Agreement).

[67] Restricted Stock Agreement Schedule A; Roth Tr. 113.

[68] JX 288 at 2.

[69] JX 276 at 1, 2; JX 357 at 3.

block on the situation."[70]  He requested a copy of Roth's original contract to "understand what the drivers were."[71]  Petras felt that Roth had received "excess value relative to what [Petras] thought was fair."[72]

Around that time, Petras concluded that Roth was underperforming.  Roth had been hired to lead both "corporate strategy" and "business development."[73]  He "did a good job" in business development but fell short on strategic planning.[74]  Roth's 2020 performance review reflected an "average year" where he "me[t] expectations."[75]  By late February 2021, Petras had begun the process of "chang[ing] Roth] out."[76]

## H.    The Secondary Offering

In early 2021, Sotera and the Sponsors began exploring a secondary offering of the company's stock.[77]  Sotera management, its outside advisors, and the Sponsors deliberated over the size of the potential offering.

---

[70] JX 284.

[71] *Id.*; *see also* JX 285.

[72] Leffler Tr. 421.

[73] Petras Tr. 150.

[74] *Id.* at 152.

[75] JX 18; *see* JX 781.

[76] JX 306 at 1.

[77] *See* Petras Tr. 190-91; Klaben Tr. 837-39.

On February 12, Petras reminded Warburg's Neary that a secondary offering generating proceeds at or above $684 million would "get[] the sponsors 2.5x on [the] original investment" and cause "all the unvested units to vest."[78] Petras expressed his "preference" to "keep th[e] secondary below [the] $684[m] hurdle if possible."[79] He viewed vesting as a "retention risk" and "prefer[red] to have a little more time as a public company before dealing with th[at] risk."[80]

Petras expressed the same view to GTCR's Mihas a few days later.[81] Mihas said that he would be guided by "what the bankers recommended[]" on offering size. He felt that since the company would "trip" the vesting threshold "in 3 months" anyway, he would prefer not to "compr[o]mise the offering size."[82] But if "the bankers recommend[ed] [$]750[m]," he would be willing to keep the offering smaller so that it would "not trip[]" vesting.[83] Petras agreed that "the bankers w[ould] guide" them, but reiterated that if the recommendation was "close[]" to

---

[78] JX 292 at 1; *see also* JX 295 at 1 ("Sponsors need to receive just shy of $685M before the B-2s vest."); JX 311 at 3 (Sotera management determining in 2020 that a $684 million offering would trigger performance unit vesting).

[79] JX 292 at 1.

[80] *Id.*

[81] JX 297 at 2.

[82] *Id.*

[83] *Id.*

hitting the $684 million threshold, they "should consider the retention risks potential."[84]

On March 11, an internal GTCR email stated that "[d]ue to the vesting issue[,]" Neary and Petras "want[ed] to keep the total proceeds $684MM."[85] Their modeling reflected that, depending on the number of shares offered—between 20 and 25 million—and "assuming around $25 [per] share[,]" the offering would generate "about the $684MM."[86] Mihas responded that he had spoken to Petras the day before, and that Petras "ha[d] no issue blowing thru the [$]684[m]" if the offering "ha[d] the demand."[87] Warburg ran similar calculations that considered whether the offering would trip the $684 million threshold.[88]

The offering was set at 25 million shares.[89] The underwriters had a greenshoe option to purchase another 3.75 million shares.[90] And Securities and Exchange Commission (SEC) rules permitted the Sponsors to "upsize" the offering by another

---

[84] *Id.* at 1.

[85] JX 321 at 2.

[86] *Id.*

[87] *Id.* at 1-2; *see also id.* at 1 (reflecting that Petras agreed that they should not offer 20 million shares if the "bankers [we]re supportive of 25 [million]").

[88] JX 325 at 1 (considering the vesting "threshold"); JX 335 at 2 ("[I]f we upsize we'd likely trigger the performance vesting threshold . . . . If we price higher than $26 [that] would obviously be closer to trigger threshold [sic] too."); *see also* JX 323 at 1-2; JX 324 at 1; JX 330 at 1; JX 588 at 1.

[89] JX 334 at 3.

[90] *Id.*

15

20%.[91] The offering price was set at $27 per share, which would net selling stockholders $26.1225 per share.[92] Thus, the secondary offering had the potential to generate approximately $880 million in proceeds.[93]

One day before the secondary offering, on March 16, the offering was 2x oversubscribed.[94] After the offering launched, however, there was weaker than expected demand.[95] Sotera's stock traded steadily below the offering price.[96] The underwriters declined to exercise the greenshoe.[97] The Sponsors did not upsize the offering.[98] When the secondary offering closed, the Sponsors netted total proceeds of $588,304,038.79, falling $94.3 million short of the vesting threshold.[99]

## I. The Margin Loan

During the summer of 2021, Sotera's stock continued to trade below the IPO price and the secondary offering.[100] Internal Warburg models showed that it was

---

[91] JX 326; JX 335; *see* 17 C.F.R. § 230.462(b).

[92] JX 338 at 3.

[93] *Id.* at 18; JX 414 at '1799.

[94] JX 334 at 4.

[95] *See* JX 352.

[96] Cunningham Tr. 473-74.

[97] *See id.* at 472-73.

[98] JX 352 (Warburg: "Just caught a bad market. Glad we didn't upsize.").

[99] JXs 347-48.

[100] *See* JX 413 at 2 (observing that the share price was "hovering at ~$22.20, a slight recovery from the all-time low for the stock" and lower than the IPO price of $23 per share and the secondary offering price of $27 per share); Roth Tr. 134.

waiting for a price recovery before launching another follow-on offering.[101] A further offering would also place downward pressure on the stock.[102]

Warburg looked for other options to pull forward proceeds and improve its IRR.[103] In the summer of 2021, it executed a margin loan for approximately $397 million using a portion of its Sotera shares as collateral.[104] The terms of the loan included a 0.5% upfront fee, plus interest.[105] Receipt of the proceeds would bring forward Warburg's IRR, but it would be dilutive to cash—even if Sotera's stock performed well.[106]

Warburg internally characterized the loan as a "realization" event.[107] Warburg presentations included the margin loan in calculating over $1.3 billion of "Realized Proceeds" from its Sotera investment.[108] This indicated a 3.4x return on Warburg's initial $381 million investment.[109]

---

[101] JX 413 at 2 (noting it would be best to do another follow-on offering when the price was "north of $25/share"); JX 410 at 18.

[102] *See* Guay Tr. 903; *see also* Chen Tr. 313.

[103] *See* Chen Tr. 374.

[104] JX 406 at 1; JX 402 at '21532.

[105] JX 368.

[106] JXs 312-13; JXs 369-70; Neary Tr. 567-68.

[107] JX 402 at 45; JX 406 at 1.

[108] JX 402 at 45; JX 410 at 1-18; JX 595 at 50; *see* Neary Tr. 601-02; Neary Dep. 142.

[109] JX 406 at 1; JX 408 at 1; Neary Dep. 144.

Nearly $400 million of that $1.3 billion was subject to repayment.[110] Repayment came sooner than Warburg had hoped. Sotera's stock did not perform well.[111] Capital calls on the loan were made, and Warburg repaid the loan early in its entirety, which reduced both its IRR and multiple of money (MoM).[112]

Sotera did not count the margin loan as a Sponsor Inflow for purposes of B-2 Unit vesting.[113]

## J. The Block Trade

In June 2022, Sotera was added to the S&P MidCap 400 Index—a benchmark index "designed to measure the [stock price] performance of 400 mid-sized companies."[114] The listing created the possibility for the Sponsors "to sell a small block" of Sotera shares.[115] The Sponsors considered making a block trade—a privately arranged sale of shares outside of public exchanges—to take advantage of the increased market demand.[116]

---

[110] Neary Tr. 602.

[111] *See* Chen Tr. 405-06.

[112] JX 472; Chen Tr. 405-06.

[113] *See* JX 376; Klaben Tr. 853-56.

[114] JX 517 (Guay Report) ¶ 54.

[115] JX 435.

[116] JX 427 at 2.

One consideration was the B-2 vesting threshold.[117]  Sotera's CFO, Scott Leffler, had resigned in May 2022 but remained employed until late July 2022. Warburg was mindful that Leffler had 675,000 B-2 Units that were unvested, which would involve "meaningful dollars" if vesting were triggered.[118]

There were several other considerations.  First, Sotera was facing its first major jury trial about Sterigenics' emissions of ethylene oxide at an Illinois facility.[119]  The Sponsors believed it would be "very bad" market signaling to sell right before that August 2022 trial.[120]  Second, Sotera's stock price remained on a "downward trajectory," and the Sponsors felt that a block sale would precipitate a further decline.[121]  Third, within days of the S&P listing, market demand generated by the index inclusion "dwindled," shrinking the opportunity from 10 million shares to just three or four million.[122]

The Sponsors opted not to execute the block sale.

---

[117] *See id.*; JX 434.

[118] JX 434 at 1 ("Triggering the B-2 [U]nits: [at a] [p]erformance threshold [of] 2.5x MOIC . . . at 2.37x today (excl. our proceeds from the margin loan) . . . will be very tight if we want to stay below."); *see also* JX 427 at 1 (contemplating whether to exercise the block trade, Nealy asked: "What would this do to trigger the Bs?  Remember we have someone who has resigned but is still employed.  Could be a big problem if we execute in June.").

[119] *See* Chen Tr. 314.

[120] *See id.*; Cunningham Tr. 477; JX 439.

[121] Chen Tr. 317 (testifying that a block trade would be a "very negative market signal"); *see* JX 415; JX 444.

[122] Neary Tr. 568-69; *see* JX 435.

## K.  Roth's Resignation

In August 2022, Petras offered Roth a position leading Sotera's M&A efforts.[123]  It was a demotion.  Roth's compensation and responsibilities would be materially reduced, and he would report to whoever replaced him as SVP of Corporate Development and Strategy.[124]  But taking the position would have allowed Roth to stay at Sotera and retain his unvested B-2 Units.[125]

Instead, Roth pursued employment elsewhere.  He had begun to look for another job in 2021 when Petras began to signal his dissatisfaction with Roth's performance.[126]  In October 2021, Roth accepted a position with another company and signed an offer letter that delayed his start date until December 31, 2022.[127]  Roth told no one at Sotera that he had accepted a job offer until March 2022.[128]

As Roth's start date neared, he asked Sotera to vest his B-2 Units early.  Sotera's compensation committee decided that vesting should proceed under the

---

[123] Roth Tr. 70-71, 73; Petras Tr. 176; JX 455.

[124] Roth Tr. 70-71; *see* Petras Tr. 285-86.

[125] Petras Tr. 177; *see* JX 455 (Petras telling Roth that "any unvested equity will be forfeited" if Roth left Sotera).

[126] *See supra* notes 74-76 and accompanying text.

[127] JX 782.

[128] JX 417; Petras Tr. 173-74.

relevant contracts and declined to vest Roth's shares early.[129]  When Roth resigned in September 2022, he forfeited his unvested equity.

In March 2024, the Sponsors conducted a secondary offering that resulted in the vesting of the B-2 Units.[130]  The B-2 Unit holders who remained at Sotera received their vested shares.[131]

### L.    This Litigation

In December 2022, Roth filed this lawsuit against Sotera.[132]  He brought claims for breaches of contract and of the implied covenant of good faith and fair dealing, conversion, to compel an accounting, and for a declaratory judgment.[133] Sotera answered the complaint in March 2023.[134]

Sotera moved for partial summary judgment on Roth's breach of contract claim and for judgment on the pleadings.  In a September 23, 2024 memorandum opinion, I granted summary judgment in part, concluding that the Restricted Stock Agreement unambiguously incorporated the pre-IPO vesting and forfeiture conditions for Roth's unvested B-2 Units, and that Roth was not entitled to severance

---

[129] Petras Tr. 125, 241; JX 165.

[130] *See* PTO ¶ 75; JX 771 at 17.

[131] Petras Tr. 206-07; JX 771.

[132] Verified Compl. (Dkt. 1).

[133] *Id.* ¶¶ 50-74.

[134] Sotera's Answer to Verified Compl. (Dkt. 9).

benefits because he refused to sign a required release.[135] I also granted judgment on the pleadings in Sotera's favor on Roth's conversion and equitable accounting claims.[136] I denied summary judgment on whether the vesting threshold for the B-2 Units was met at the time of Roth's resignation, and denied judgment on the pleadings as to Roth's claims for breach of the implied covenant of good faith and fair dealing and declaratory judgment.[137] Left for trial were the factual determination of whether Sponsor Inflows exceeded Sponsor Outflows by 2.5 times before Roth's departure (for the breach of contract claim), and the implied covenant and declaratory judgment claims.

Trial took place from July 7 to 9, 2025.[138] Post-trial briefing was complete as of November 24.[139] Post-trial argument was held on December 8, and the matter was submitted for decision at that time.[140]

---

[135] Mem. Op. Regarding Mots. for Partial Summ. J. and for J. on Pleadings (Dkt. 176) ("Mem. Op.") 2, 18, 26, 35.

[136] *Id.* at 2, 27, 35.

[137] *Id.* at 2, 19, 27, 35.

[138] *See* Trial Trs., Vols. I-III.

[139] *See* Pl.'s Corrected Opening Post-trial Br. (Dkt. 290) ("Pl.'s Opening Post-trial Br."); Defs.' Answering Post-trial Br. (Dkt. 292); Pl.'s Post-trial Reply Br. (Dkt. 295).

[140] Tr. of Post-trial Oral Arg. (Dkt. 299).

## II. LEGAL ANALYSIS

Roth claims that Sotera breached its contractual obligations and the implied covenant of good faith and fair dealing by purposely structuring corporate transactions and forcing his resignation to prevent his B-2 Units from vesting. He seeks declarations that the vesting conditions for B-2 Units were met by March 2021 and that Sotera constructively terminated him, as well as money damages of approximately $13.2 million representing the value of the unvested B-2 and Super B-2 Units he lost upon his resignation.[141] Roth has the burden of proving his claim by a preponderance of the evidence.[142] He did not meet that burden.

My analysis proceeds in three parts. First, I address Roth's breach of contract claim. I conclude that under the unambiguous terms of the governing agreements, the Sponsors Inflow Trigger Date was unmet before Roth resigned. Second, I analyze Roth's claim for breach of the implied covenant of good faith and fair dealing. I find that Roth did not show Sotera acted unreasonably or in bad faith when navigating financing and liquidity events, or that Sotera constructively terminated him. Third, because Roth's breach of contract and implied covenant

---

[141] PTO § V.A ¶¶ 1, 3; Thomas Tr. 744, 758.

[142] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015) ("Proof by a preponderance of the evidence means proof that something is more likely than not."); *In re Coverdale*, 1987 WL 758002, at *3 (Del. Ch. Aug. 3, 1987) (explaining that the "burden of proof in civil cases in Delaware is typically one of preponderance of the evidence" (citation omitted)).

23

claims fail, I deny his duplicative request for a declaratory judgment. I do not reach Roth's request for damages.

## A. Breach of Contract

Roth claims that Sotera breached its obligations in the Restricted Stock Agreement and Senior Management Agreement when, in September 2022, it "took 620,523 shares of stock from him in connection with his Good Reason resignation."[143] As I previously held at the summary judgment stage, the relevant vesting and forfeiture conditions survived the company's transition from a limited liability company to a limited partnership to a public corporation, and remained applicable to Roth's unvested Sotera stock through an incorporation provision in his Restricted Stock Agreement.[144]

To prevail on his breach of contract claim, Roth must show "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[145] The analysis is governed by settled principles of contract interpretation.

---

[143] Pl.'s Opening Post-trial Br. 54; *see also* PTO ¶ 72 (stipulating that "[o]n September 14, 2022, Sotera removed 620,523 shares of Sotera Health Company stock from [Roth's] Compushare account").

[144] Mem. Op. 25, 35; *see* Restricted Stock Agreement § 3(b).

[145] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *see also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (reciting the elements of a breach of contract claim).

"Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[146] "When interpreting a contract, [the] Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement.'"[147]

The key contract provision is Section 3(b) of the Restricted Stock Agreement, which incorporates the vesting conditions from the Topco Parent LP Agreement.[148] Under those agreements, the B-2 Units vest upon a Sponsors Inflow Trigger Date.[149] This trigger date is defined as "the first date on which [] the Sponsor Inflows for such Sponsor through such date are at least two and one-half (2 ½) times the Sponsor Outflows for each Sponsor through such date."[150] If the vesting conditions were satisfied as of Roth's resignation in September 2022, then Sotera breached the Senior Management Agreement and Restricted Stock Agreement by refusing to recognize the vesting and non-forfeiture of Roth's equity. Thus, to prevail on his breach of

---

[146] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[147] *Id.* at 368 (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[148] Mem. Op. 22; Restricted Stock Agreement § 3(b).

[149] Topco Parent LP Agreement § 3.02(c)(ii); *see also* Topco Parent LLC Agreement § 3.02(d)(ii).

[150] Topco Parent LP Agreement § 1.01; *see also* Topco Parent LLC Agreement § 1.01.

25

contract claim, Roth must prove that both GTCR and Warburg received Sponsor Inflows that exceeded Sponsor Outflows by 2.5x as of September 2022.

The parties have stipulated to certain cash inflows received by the Sponsors between 2016 and 2021.[151] Roth contends that two additional amounts must be counted, which would trigger the vesting conditions: (1) the May 2015 $1.13 billion payment received by GTCR Fund IX in connection with the recapitalization transaction;[152] and (2) the funds Warburg pulled forward through the June 2021 margin loan.[153] As explained below, neither the GTCR Fund IX payment nor the Warburg margin loan created a Sponsor Inflow.

---

[151] The parties stipulated to the following Sponsor Inflows: (1) "[i]n November 2016, Warburg received a Sponsor Inflow of $196,967,609, and GTCR received a Sponsor Inflow of $131,311,739"; (2) "[i]n November 2017, Warburg received a Sponsor Inflow of $115,062,496, and GTCR received a Sponsor Inflow of $76,708,331"; (3) "[i]n August 2018, Warburg received a Sponsor Inflow of $54,503,390, and GTCR received a Sponsor Inflow of $36,335,593"; (4) "[i]n November 2018, Warburg received a Sponsor Inflow of $42,038,419, and GTCR received a Sponsor Inflow of $28,025,613"; (5) "[i]n August 2019, Warburg received a Sponsor Inflow of $179,844,813, and GTCR received a Sponsor Inflow of $119,896,542"; (6) "[i]n September 2019, Warburg received a Sponsor Inflow of $51,680,129, and GTCR received a Sponsor Inflow of $34,453,419"; (7) "[i]n December 2019, Warburg received a Sponsor Inflow of $138,173,319, and GTCR received a Sponsor Inflow of $92,115,546"; and (8) "[i]n November 2020, Warburg received a Sponsor Inflow of $1,349,057, and GTCR received a Sponsor Inflow of $899,371." PTO ¶¶ 54-61.

[152] Pl.'s Opening Post-trial Br. 20.

[153] *Id.* at 48, 55.

1. <u>The Fund IX Payment</u>

Roth contends that the $1.13 billion payment received by GTCR Fund IX in May 2015 must be counted as a Sponsor Inflow for purposes of calculating the vesting threshold.[154] The defendants, however, insist that Fund IX is a separate corporate entity from the Sponsor defined in the governing agreements and that the 2015 payment was a buyout of a predecessor entity, not a distribution on the newly created equity.[155] The defendants are correct.

The Topco Parent LLC Agreement defines Sponsor Inflows as:

> [W]ith respect to each Sponsor . . . all cash payments by or on behalf of the Company . . . ***received by such Sponsor*** with respect to or in exchange for ***Membership Units*** . . . from the Closing through the date of determination of the Sponsor Inflows.[156]

Roth's argument is inconsistent with the plain language of this definition for two reasons. The payment was neither received by a Sponsor nor with respect to Membership Units.

---

[154] *Id.* at 14-15, 20.

[155] Defs.' Answering Post-trial Br. 50-51.

[156] Topco Parent LLC Agreement § 1.01 (emphasis added) (defining "Sponsor Inflows" as "with respect to each Sponsor, without duplication, as of any date, all cash payments by or on behalf of the Company (including distributions but excluding (a) Tax Distributions, (b) management fees, (c) expense reimbursements and (d) indemnification payments) received by such Sponsor with respect to or in exchange for Membership Units (whether such payments are received from the Company or any third party) from the Closing through the date of determination of the Sponsor Inflows").

a.  Not a Sponsor

The Topco Parent LLC Agreement defines the GTCR-affiliated Sponsor as the "GTCR Members together and their [respective] Permitted Transferees."[157] "GTCR Members," in turn, is defined to mean "GTCR Fund XI/A LP, GTCR Fund XI/C LP, GTCR Co-Invest XI LP and their respective Affiliates that are Members."[158] "Permitted Transferees" include the spouse, relatives, administrator, or trustees of a Management Member.[159] GTCR Fund IX is not included in these definitions. Nor is it listed as a Member in Schedule A to the Topco Parent LLC Agreement.[160]

Roth attempts to overcome this exclusion by arguing that Fund IX qualifies as an "Affiliate" of Fund XI because both funds are under the "common control" of

---

[157] *Id.* (defining "Sponsor" as "either (i) the WP Members together and their Permitted Transferees, as the context requires, or (ii) the GTCR Members together and their Permitted Transferees, as the context requires").

[158] *Id.* (defining "GTCR Members" as "collectively, GTCR Fund XI/A LP, GTCR Fund XIIC LP, GTCR Co-Invest XI LP and their respective Affiliates that are Members, each of which shall act through the applicable GTCR Designated Sponsor Fund except as expressly provided otherwise herein").

[159] *Id.* (defining "Permitted Transferees" as "(i) with respect to any Management Member, any spouse, lineal descendant, parent, heir, sibling, executor, administrator, testamentary trustee or legatee of such Member or any trust or other Person in which the sole (direct or indirect) beneficiaries or other equity holders thereof are such Member or any of the other Persons referred to herein; (ii) with respect to any Sponsor, any Affiliate of such Sponsor; and (iii) with respect to the Co-Investor, any Affiliate of such Co-Investor and any Co-Invest Partner").

[160] *Id.* at Schedule A; *see also id.* at Schedule B (listing the specific Fund XI entities that made new capital contributions to Topco Parent LLC, of which Fund IX is not included).

GTCR LLC.[161]  The Topco Parent LLC Agreement defines "Affiliate" as "with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with, such Person."[162]  "'Control' means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and 'Controlled' has a correlative meaning."[163] GTCR Fund XI and Fund IX were not under common control, however.

GTCR LLC does not "Control" these funds.[164]  Rather, GTCR LLC is a separate entity formed to provide advisory services to the various investment funds.[165]  Although Roth points out that the investment committee members for both Fund IX and Fund XI were also GTCR LLC employees,[166] GTCR LLC does not direct the management and policies of the funds.  Each GTCR fund has its own separate investment committee, which makes the major investment decisions for and exclusively governs the specific fund.[167]

---

[161] Pl.'s Opening Post-trial Br. 11-13.

[162] Topco Parent LLC Agreement § 1.01; *see also id.* (defining "Person" as "any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, governmental entity or any other entity").

[163] *Id.*

[164] *See supra* note 2 and accompanying text.

[165] *See* Cunningham Tr. 457, 483-84.

[166] Pl.'s Opening Post-trial Br. 11-13.

[167] *See* Cunningham Tr. 490; Mihas Tr. 627-28.

Fund IX and Fund XI were separate pools of capital, raised years apart.[168] They had different bases of limited partner investors.[169] And they were governed by different investment committees.[170] Because they were separate entities, not under the common Control of GTCR LLC, Fund IX is not an Affiliate of Fund XI. I cannot rewrite the contractual definition of Sponsor to include an exited fund.[171]

### b. Not for Membership Units

Even if Fund IX could be considered part of the Sponsor, the $1.13 billion payment was not made "with respect to or in exchange for Membership Units."[172]

---

[168] *See* Cunningham Tr. 459, 461 (testifying that GTCR Fund IX was raised in 2006 and GTCR Fund XI was raised in 2014); *id.* at 490 (testifying that GTCR investment committees are fund by fund, and there is not an overarching GRCR LLC structure); *see also supra* note 3 and accompanying text.

[169] *See* Cunningham Tr. 462. Roth argues that "[r]oughly half the limited partners of Fund IX also invested in Fund XI." Pl.'s Opening Post-trial Br. 11 n.1 (citing JX 590 at 12-15 and JX 591 at 11-15). The fact that there was some overlap in ownership is not determinative common control. The investment committees—not the fund owners—were charged with making major investment decisions for the fund. *See* Cunningham Tr. 490; *cf. Anglo Am. Sec. Fund, L.P. v. S.R. Global Intern. Fund, L.P.*, 829 A.2d 143, 154 (Del. Ch. 2003) (stating that, "[u]nder the terms of the [governing a]greement, the limited partners have absolutely no control over the governance and management of the Fund[s]").

[170] *See* Cunningham Tr. 490.

[171] Roth cites two GTCR entities' SEC filings to claim that GTCR Fund IX and XI are "affiliated with GTCR LLC." Pl.'s Opening Post-trial Br. 12-13; JX 581 at 9; JX 569 at 8. These references are irrelevant to the contractual definitions for when a Sponsor Inflow is achieved. SEC rules concerning beneficial ownership cannot supplant the terms of the parties' agreements.

[172] Topco Parent LLC Agreement § 1.01 (defining "Sponsor Inflows"); *see supra* note 156 and accompanying text.

"Membership Units" is defined as the equity interests—the Class A and Class B Units—of the newly formed Topco Parent LLC.[173]

The May 2015 payment to Fund IX was for the buyout of its equity in the Predecessor Parent.[174] As Sotera General Counsel Matthew Klaben credibly testified, the May 2015 transaction paid off the old capital structure, removed Fund IX from the enterprise, and revised the capital structure going forward.[175] It was only under this new structure that the B-2 Units and their corresponding vesting hurdles were created.[176]

Sotera's contemporaneous records corroborate this testimony. Its audited financial statements record May 15, 2015 as a dividing line in the company's capital structure.[177] The financial statements categorize the enterprise into "Predecessor" and "Successor" entities, with the divide being the consummation of the stock

---

[173] Topco Parent LLC Agreement § 1.01 (defining "Membership Units" as "membership interests in the Company (including, without limitation, Class A Units and Class B Units)" that represent "a limited liability company interest with the rights, powers and preferences provided in this Agreement and by the Act").

[174] PTO ¶ 14; *see supra* Section I.A (detailing how SNH LLC used financing to pay the Predecessor Parent approximately $1.13 billion to purchase SHI's outstanding stock, resulting in the Predecessor Parent divesting itself of its interest).

[175] *See* Klaben Tr. 787.

[176] *See* Cunningham Tr. 465; *supra* Section I.C (explaining that Roth's employment and equity grants occurred in late 2015 and early 2016, months after the recapitalization).

[177] JX 7 at 20.

acquisition that brought Sterigenics into the revised corporate structure.[178] They also show that the Predecessor entity's equity-based awards vested upon the exit of GTCR Fund IX.[179] The investment by GTCR Fund XI and Warburg, by contrast, established "a new structure, a new investment vehicle, with new investors and new terms for the investment" for the Successor, including B Units.[180]

Adopting Roth's interpretation would lead to a commercially absurd result.[181] Each time a B Unit was awarded, a participation threshold was set to account for investment activity before the grant to avoid "spring load[ing]" and conferring a windfall on the grantee.[182] Roth's own participation threshold was set at zero, which shows that the 2015 recapitalization reset the investment profile for the company and that Fund IX's exit was not intended to be incorporated into the B Unit grants issued post-recapitalization.[183] If the $1.13 billion buyout of Fund IX counted as a Sponsor Inflow for the new enterprise, GTCR's return threshold would have been

---

[178] *Id.*

[179] *Id.* at 49; Klaben Tr. 805.

[180] Klaben Tr. 787; Cunningham Tr. 465.

[181] *See Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1211 (Del. 2021) ("Delaware courts read contracts as a whole, and interpretations that are commercially unreasonable or that produce absurd results must be rejected."); *Osborn*, 991 A.2d at 1160 ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

[182] *See* Klaben Tr. 806-08.

[183] *See id.* at 808.

met upon its investment in Sterigenics.[184]  Nothing in the record suggests that anyone—including Roth—believed in 2015 that Fund IX's exit generated a Sponsor Inflow.  Roth seems to have developed that view after his resignation.

Accordingly, the $1.13 billion payment to GTCR Fund IX was a buyout of a predecessor entity's equity by a distinct investment fund.[185]  It does not qualify as a Sponsor Inflow under the plain language of the governing agreements.

### 2.    The Margin Loan

Roth next argues that the $397 million Warburg margin loan, executed in the summer of 2021, constitutes a Sponsor Inflow.[186]  He asserts that because Warburg internally characterized the loan as a realization event and used the funds to "pull forward proceeds" to improve its IRR, the funds must be counted toward the vesting threshold.[187]  Warburg's internal discussions about the loan are irrelevant to the transaction's true economic nature.

The margin loan does not qualify as a Sponsor Inflow under the plain language of the governing agreements.  As defined above, a Sponsor Inflow requires a "cash

---

[184] *See id.* at 802-03.

[185] *See supra* Section I.B.

[186] Pl.'s Opening Post-trial Br. 55; *see supra* Section I.I (detailing the summer 2021 margin loan).

[187] JX 281 (asking "do we want to pledge our stock for a loan that allows us [to] pull forward proceeds"); *see* JX 305 (stating that "IRR/distribution management is clearly the single largest driver" of margin loan facilities); JX 408 at 3 (Warburg presentation referring to $1.3 billion "returned" from Sotera, including the margin loan).

payment" received "with respect to or in exchange for Partnership Units."[188] The

margin loan was not a cash payment in exchange for units. It was a loan secured by

Sotera stock as collateral.[189] Warburg retained ownership of the shares and bore the

full risk of the investment.[190]

This distinction is not merely semantic. Warburg owed the money back to the

lender.[191] When Sotera's stock price declined, Warburg faced capital calls and

ultimately had to repay the loan early, plus fees and penalties.[192] Classifying loan

proceeds subject to repayment as a "cash payment" representing a return on

investment would be, as Sotera's outside counsel contemporaneously advised

Klaben, an "anomalous outcome."[193] If the loan proceeds were a Sponsor Inflow,

---

[188] Topco Parent LP Agreement § 1.01 (defining "Sponsor Inflows"); *see supra* note 156 and accompanying text (defining "Sponsor Inflows" in the Topco Parent LLC Agreement).

[189] Neary Tr. 566 ("A margin loan is a loan against a liquid stock position."); JX 373 at 1 (Klaben seeking legal advice regarding a loan "secured by a lien on the SHC stock").

[190] Guay Tr. 901-02 (explaining that a private equity firm that takes out a margin loan "still own[s] the shares, they still bear the full risk of the shares[]" and are "right back to the same position they were before" after repayment).

[191] Neary Tr. 558 ("These are loans. We owe the money back."); Chen Tr. 310-11 ("Warburg Pincus Fund 11, is on the hook for making [—] paying back margin calls as well as ultimately repaying the entire loan . . . .").

[192] *See* Chen Tr. 311; *supra* notes 110-112 and accompanying text.

[193] JX 376 at 2.

the subsequent repayment would necessarily be a Sponsor Outflow, negating the benefit for vesting purposes.[194]

Roth makes much of internal Warburg emails suggesting the firm takes "carry" on margin loans and that a Warburg partner included the margin loan in an internal presentation calculating Warburg's "Realized Proceeds."[195] But, again, internal descriptions do not alter the economic reality of the transaction or the definitions in the Topco Parent LP Agreement.[196] In any event, Warburg never took carry on the Sotera margin loan, treating it instead as a base capital distribution.[197] Because the margin loan proceeds were risk capital subject to repayment, they were not a "cash payment" and therefore not a Sponsor Inflow.[198]

---

[194] Topco Parent LP Agreement § 1.01 (defining "Sponsor Outflows" as including "all cash payments to or for the benefit of the Company . . . by such Sponsors").

[195] JX 371 at 1 (Mihas writing "they take carry when the[y] do this according to [Neary]"); JX 408 at 3.

[196] Chen Tr. 389-90 (explaining that the word "proceeds" was used in the context of internal talking points, which is "different than cash payments in the context of a heavily negotiated legal document with really specific definitions").

[197] Neary Tr. 594 ("[W]e didn't take carry on it."); Chen Tr. 311 ("My understanding is we did not. It was treated as a base capital distribution.").

[198] Topco Parent LP Agreement § 1.01.

Moreover, the definition of Sponsor Inflow requires each Sponsor to independently meet the threshold.[199] GTCR did not participate in the margin loan.[200] Because I have concluded that the May 2015 payment to GTCR Fund IX was not a Sponsor Inflow, GTCR had not met the 2.5x threshold as of July 2021. As a result, even if the margin loan proceeds counted as a Sponsor Inflow for Warburg, the Sponsors Inflow Trigger Date would not have occurred because the threshold was not met for both Sponsors.[201]

\* \* \*

In sum, Roth failed to prove that the Sponsors Inflow Trigger Date occurred before his departure. Neither the GTCR Fund IX Payment nor the Warburg margin loan constitutes a Sponsor Inflow under the clear and unambiguous terms of the governing agreements. As a result, Sotera did not breach its contractual obligations when it declined to vest Roth's B-2 Units before his resignation.

---

[199] *Id.* (defining "Sponsors Inflow Trigger Date" as "the first date on which [] the Sponsor Inflows for *each* Sponsor through such date are at least two and one-half (2 1/2) times the Sponsor Outflows for *such* Sponsor" (emphasis added)); *see* PTO ¶ 17.

[200] Cunningham Tr. 474 (testifying that no GTCR fund has ever taken out a margin loan); JX 308 ("It looks like GTCR is going to be a pass on the margin loan for Sotera.").

[201] *See* JX 376.

36

## B.    Breach of the Implied Covenant

Roth next claims that Sotera breached the implied covenant of good faith and fair dealing.[202]  The implied covenant "is a limited and extraordinary remedy and is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[203]  Obligations under the implied covenant "should be implied only in rare instances."[204]

The implied covenant is generally used in two scenarios: (1) as a gap-filler where "a situation has arisen that was unforeseen by the parties" and (2) "when a party to the contract is given discretion to act [and] the discretion has been used in a way that is impliedly proscribed by the contract's express terms."[205]  It "cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty unattached to the underlying legal documents.'"[206]

Roth claims that the implied covenant fills a gap in the agreements governing his B-2 Units: his grant notice, the Topco Parent LLC/LP Agreements, and the

---

[202] Pl.'s Opening Post-trial Br. 55.

[203] *VH5 Cap., LLC v. Rabe*, 2023 WL 4305827, at *24 (Del. Ch. June 30, 2023) (citation omitted).

[204] *Homan v. Turoczy*, 2005 WL 2000756, at *18 (Del. Ch. Aug. 12, 2005).

[205] *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 504 n.93 (Del. 2019).

[206] *DG BF, LLC v. Ray*, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021) (citation omitted).

Restricted Stock Agreement.[207] He described the gap in these agreements as a failure to define how "the Sponsors are to exercise their discretion" to execute capital markets transactions, and a failure to "expressly require either party to avoid intentional conduct that would prevent vesting."[208] The agreements do not mandate a specific timeline or guarantee a particular exit for the Sponsors to monetize their investment. Roth contends that the implied covenant fills this gap, preventing Sotera (and the Sponsors) from exercising their discretion in bad faith to intentionally thwart the vesting of B-2 Units.[209]

Roth is correct that parties to a contract must "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[210] Indeed, an employer may not "use[] its 'superior bargaining power [to] . . . depriv[e] the employee of compensation that is clearly identifiable and is related to the employee's past service.'"[211] Yet he has not proven that Sotera (or the Sponsors) acted in bad faith

---

[207] Pl.'s Post-trial Opening Br. 57-58.

[208] Pl.'s Post-trial Reply Br. 18-19.

[209] Pl.'s Post-trial Opening Br. 57-58; *see* Pl.'s Post-trial Reply Br. 18-19.

[210] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citation omitted).

[211] *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442 (Del. 1996) (quoting *Magnan v. Anaconda Indus., Inc.*, 479 A.2d 781, 788 (Conn. 1984) (citation omitted)); *see also* Mem. Op. 30.

or exercised their discretion to arbitrarily or unreasonably deprive him of compensation.

Roth's implied covenant has two primary facets. First, he asserts that Sotera intentionally manipulated corporate transactions to keep Sponsor Inflows just below the $684 million threshold that would have caused B-2 Units to vest. Second, he argues that once it became clear the vesting threshold would be met, Petras demoted Roth to force him into a Good Reason resignation. Roth has not proven either theory.[212]

### 1. Structuring Transactions to Evade Vesting

Roth contends that Sotera breached the implied covenant by "block[ing] any transaction that would compel it to recognize vesting, no matter what the terms of the transaction[.]"[213] He accuses Sotera of acting to prevent the vesting of B-2 Units: structuring Sotera's IPO to avoid a payout to the Sponsors; artificially capping the size of the March 2021 secondary offering and directing the bankers not to exercise the greenshoe option; and abandoning a block trade in 2022. He argues that the IPO and secondary offering were structured "so as to avoid vesting criteria[,]" and the

---

[212] To the extent Roth advanced other claims or theories of liability—such as unjust enrichment or additional breaches of the implied covenant of good faith and fair dealing— he did not press them in his post-trial briefing. Such claims are therefore deemed waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (explaining that arguments not addressed in post-trial briefing are waived).

[213] Pl.'s Opening Post-trial Br. 58.

39

block trade was "specifically not taken" because of its "perceived impact on vesting."[214]

Roth did not prove that these actions or inactions breached the implied covenant. The record shows that Sotera and the Sponsors were mindful of the vesting criteria in considering the transactions. But none of their decisions were made arbitrarily or in bad faith. To the contrary, the ultimate decisions on the transactions were driven by legitimate economic and business considerations that had nothing to do with Roth.

### a.    The IPO

Roth asserts that the decision to undertake an IPO was influenced by Sotera's desire to prevent B-2 Units from vesting. The Topco Parent LP Agreement does not treat an IPO as a vesting event.[215] He argues that the Board could have pursued a full or partial sale of the company—which would have generated Sponsor Inflows— but deliberately chose an IPO to avoid vesting.[216]

---

[214] *Id.* at 60.

[215] Topco Parent LP Agreement § 1.01 (excluding IPO from the defined term "Sale of the Company," which is a vesting event for B-1 Units under Section 3.02(c)(i)(B)). Section 13.03 also provides that "vesting and termination of the awards . . . shall continue" after an IPO, indicating that an IPO is not itself a vesting event. *Id.* § 13.03; *see also* JX 213 at 12 (presentation stating that "a primary IPO in and of itself should not affect the vesting of the management units").

[216] Pl.'s Opening Post-trial Br. 24.

40

The evidentiary record refutes this contention. The Board explored the sale of all or part of the company, which could have caused B-2 Units to vest.[217] It concluded, on the advice of JP Morgan, that an IPO was the appropriate path.[218]

Moreover, the contractual threshold for B-2 Unit vesting was not achieved at the time of the IPO.[219] The November 2020 IPO was a primary offering, meaning the proceeds were used to pay down the company's debt to reach a leverage ratio acceptable to the public markets.[220] The private equity Sponsors did not sell any shares or receive any proceeds from the IPO.[221] It was, as Warburg's Chen testified, "a financing event for the company and not a liquidity event for the investors."[222]

Roth also avers that Sotera breached the implied covenant by choosing not to accelerate vesting for B-2 Unit holders in connection with the IPO. The implied covenant cannot, however, be used to penalize a party for refusing to gratuitously

---

[217] *See supra* notes 41-43 and accompanying text.

[218] Cunningham Tr. 463; JX 234 at '2442; JX 238 at '2569.

[219] Roth cites to portions of the record where Sotera determined, in connection with the IPO, to recognize an approximately $4.9 million compensation expense related to all historical B-Unit grants. Pl.'s Opening Post-trial Br. 34-35; *see* JX 183. But the decision was not an admission that B-2 Unit vesting was soon to occur. *See* Klaben Dep. 319-20. It was based on an application of GAAP to a public company with shares that could now trade in a liquid market. *See* Rahe Dep. 156-57; JX 252 at '0959.

[220] *See* Neary Tr. 555; Petras Tr. 186; *see supra* Section I.E.

[221] *See* Chen Tr. 299; *see supra* notes 103-113 and accompanying text.

[222] Chen Tr. 299.

amend a contract,[223] or declining to voluntarily grant a benefit that the plaintiff never secured at the negotiating table.[224]

Although some Sotera directors considered whether to accelerate the vesting of B-2 Units ahead of the IPO,[225] there is no evidence that they were motivated by a desire to deprive Roth of the benefit of his bargain.[226] Sotera opted not to vest the Units because the Board determined doing so would not be in Sotera's best interest.[227] Instead, it chose to allow vesting in the ordinary course, consistent with the terms of the governing agreements.[228]

There were several valid business reasons for that conclusion. First, Sotera had disclosed to the SEC that it would convert the B-2 Units to restricted stock units upon the IPO, subject to the same vesting criteria as the B-2 Units.[229] Second, there

---

[223] *See Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) ("A party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party.").

[224] *See Blaustein v. Lord Baltimore Cap. Corp.*, 84 A.3d 954, 959 (Del. 2014) (explaining that "[t]he implied covenant of good faith and fair dealing cannot be employed to impose new contract terms that could have been bargained for but were not").

[225] *See* JX 199.

[226] Again, an IPO was not a vesting event. *See supra* note 215 and accompanying text.

[227] *See* JX 204 at 2 (Petras outlining reasons why it would be problematic for Sotera to accelerate vesting); *supra* notes 46-50 and accompanying text. Roth accuses Petras of "quash[ing]" accelerated vesting. Pl.'s Opening Post-trial Br. 26. But there is no evidence that Petras had the ability to control the decision-making of Sotera's Board. *See* Petras Tr. 178 (testifying he was "one voice in the room"); Klaben Tr. 875.

[228] Klaben Tr. 874-75, 877-78; JX 252 at '0708.

[229] JX 196 (draft S-1 filed with SEC on October 8, 2020); JX 200; Petras Tr. 183-84.

was no contractual obligation to accelerate vesting, which would have been an uncommon step.[230] Third, early vesting could have negative economic consequences for Sotera.[231] Fourth, the Board understood that accelerated vesting created retention risks, and that Sotera needed leadership stability while transitioning to a public company.[232] Sotera's Board was also advised by an independent advisor on how to handle management compensation post-IPO, and adopted its recommendation to "put in place a series of new awards . . . to provide new value going forward from the IPO."[233]

b. The Secondary Offering and Greenshoe

Roth next argues that Sotera deliberately capped the size of the March 2021 secondary offering and blocked the exercise of the underwriter's greenshoe option to ensure Sponsor Inflows remained just below the $684 million vesting threshold.[234] He cites several emails showing that Petras and the Sponsors were acutely aware of the $684 million threshold and monitored how the offering size could affect the

---

[230] Guay Tr. 893-94 (testifying that acceleration of vesting at an IPO is not "a common thing" to do).

[231] *Id.*

[232] JX 204; Petras Tr. 180-81; Neary Tr. 554 (testifying that B-2 Units were "a good retention tool" that provided "[g]ood stability during the first year of the IPO"); Mihas Tr. 614-15; *see also* Guay Tr. 893-94 (giving an example of another company to show the retention risk in acceleration of vesting in connection with an IPO).

[233] Klaben Tr. 874; JX 252 at '0708.

[234] Pl.'s Opening Post-trial Br. 60.

unvested B-2 Units.[235] For example, in February 2021, Petras told Neary and Mihas he had a "preference" to keep the secondary offering below the hurdle to avoid "retention risks[.]"[236] Similarly, in mid-March, a GTCR principal wrote that "[d]ue to the vesting issue," Petras and Neary "want[ed] to keep the total proceeds [at] $684MM."[237] Roth claims that these communications prove the Sponsors weaponized their discretion over liquidity events to intentionally thwart his compensation.

But considering the vesting implications of a corporate transaction does not, by itself, constitute bad faith. The implied covenant is breached only if the defendants exercised their discretion arbitrarily or unreasonably to deprive Roth of the fruits of his bargain.[238] The record establishes that market dynamics—not a scheme to evade vesting—were the driving considerations.[239]

First, contemporaneous communications demonstrate that market conditions dictated the size of the offering. Warburg's Neary wrote that avoiding the vesting

---

[235] *Id.* at 34-38 (citing JXs 292, 295, 319, 323, and others).

[236] JX 292 at 1; JX 297 at 2; *see supra* Section I.H.

[237] JX 321 at 2; *see also* JX 319.

[238] *Nemec*, 991 A.2d at 1126-28 (holding a party does not act in bad faith by relying on contract provisions for which it bargained).

[239] *See* Cunningham Tr. 466 (explaining that the secondary was fueled by what "the market would bear"); Neary Tr. 561 (testifying that the goal was optimizing execution "over the long-run"); JX 324.

trigger was "not the governor[]" of the offering size, but a "nice to have," stressing it was "more important to size for optimal execution and trading post deal."[240] GTCR's Mihas similarly testified that the Sponsors needed to balance retention risks with the offering size, but agreed to let the bankers guide the transaction.[241] Petras was also on board with "max[ing] out" the secondary,[242] and had no "issue blowing thr[ough]" the threshold if the market demand supported it.[243]

Second, the non-exercise of the greenshoe and upsize options were reasonable decisions. The offering was initially oversubscribed, but demand weakened after the launch and Sotera's stock traded steadily below the offering price.[244] As GTCR's Sean Cunningham explained, exercising a greenshoe or upsizing the offering when the market price was dropping would have been economically irrational.[245] In fact, Warburg was relieved in 2021 that it had chosen not to upsize because the underwriters had to support the stock using their own balance sheets.[246]

---

[240] JX 324.

[241] Mihas Tr. 614-16.

[242] JX 297; *see also* JX 321; JX 341.

[243] JX 321 at 2.

[244] JX 352; Cunningham Tr. 472-74; Neary Tr. 556-58.

[245] Cunningham Tr. 469-70, 473-74.

[246] JX 345 ("Glad we didn't upsize.").

Finally, Roth adduced no credible support for his theory that the greenshoe went unexercised because Petras instructed former CFO Leffler to kill it.[247] Roth highlights Leffler's deposition testimony that Petras instructed him to prevent the underwriters from exercising the greenshoe.[248] But Leffler does not seem to be an impartial witness; Roth's counsel has even claimed privilege over conversations with Leffler.[249] More importantly, Leffler walked back his suggestion that Petras interfered in the offering, and could not identify a single instance when Petras told him to interfere with the B-2 Units.[250] Roth's reliance on Leffler—who declined to appear live at trial—does not meet his burden of proof on this claim.[251]

When all is considered, the size of the secondary offering and the underwriters' decision to forgo the greenshoe were primarily driven by market demand. Because the Sponsors did not exercise their discretion arbitrarily or in bad faith, Roth's implied covenant claim on this basis fails.

---

[247] Pl.'s Opening Post-trial Br. 38-39 (citing Leffler Tr. 416-17, Leffler Dep. 57-58, JX 469).

[248] *Id.* at 6, 38-39.

[249] *See* Leffler Tr. 433.

[250] *Id.* at 446-47.

[251] Petras's in-court testimony is unrebutted by credible evidence. *Id.* at 197-98.

### c. The Block Trade

Roth's final argument about the alleged manipulation of corporate transactions centers on Warburg's decision not to pursue a June 2022 block trade. Roth contends that the block trade was "specifically not taken" because of its "perceived impact on vesting."[252] The record suggests otherwise.

It is true that the Sponsors considered the B-2 vesting threshold when evaluating the trade. Warburg was mindful that Leffler had recently resigned but remained employed until July 2022 and held 675,000 unvested B-2 Units that would result in the payout of "meaningful dollars" if the trade triggered vesting.[253] Acknowledging the economic consequences of a transaction does not, however, equate to bad faith.

Warburg had multiple legitimate business reasons for declining to execute the block trade.[254] First, Sotera was facing its first major jury trial in August 2022 regarding Sterigenics' ethylene oxide emissions in Illinois.[255] The Sponsors felt that it would send a "very bad" signal to the market if insiders sold a significant block of

---

[252] Pl.'s Opening Post-trial Br. 60.

[253] Chen Tr. 313-15, 318, 399 (detailing the market and business factors weighing against the trade); *see supra* Section I.I.

[254] Cunningham Tr. 477-78; Chen Tr. 313-15; Neary Tr. 570-71; JX 437 at 3 (Neary email listing three important considerations for not executing the block sale).

[255] Neary Tr. 570; Chen Tr. 314.

stock just weeks before a major trial.[256] Second, Sotera's stock price was on a downward trajectory, and the Sponsors reasonably feared a block sale would precipitate a further decline.[257] And third, the window of opportunity closed quickly. Market demand generated by Sotera's midcap index inclusion dwindled within days.[258]

Faced with bad optics, a falling stock price, and shrinking demand, Warburg made a logical choice to abandon the block trade. The decision was grounded in legitimate economic and market considerations—not an arbitrary desire to avoid B-2 Unit vesting. The implied covenant does not obligate a party to undertake a commercially disadvantageous transaction to trigger the vesting of another party's equity.[259]

### 2. Constructive Termination

Roth argues that Sotera breached the implied covenant of good faith and fair dealing by "constructively terminat[ing]" him "to evade having to vest and

---

[256] Chen Tr. 314; Neary Tr. 570-71.

[257] Chen Tr. 314; Cunningham Tr. 477-78.

[258] Guay Tr. 905; Neary Tr. 568-69; Chen Tr. 314-15.

[259] *See Energy Transfer, LP v. Williams Cos.*, 346 A.3d 1089, 1113 (Del. 2023) ("[A]n obligation to take reasonable actions . . . does not require a party to sacrifice its own contractual rights for the benefit of its counterparty." (citation omitted)); *cf. Dunlap*, 878 A.2d at 444 ("The [implied covenant of good faith and fair dealing] does not . . . require an insurer to risk financial exposure in order to assist the insured.").

48

ultimately pay out the performance equity" used to recruit him in 2015.[260] He contends that Petras purposefully manufactured a reorganization to demote him, knowing it would trigger a "Good Reason" resignation before the B-2 Units were going to vest. This claim fails because Roth left Sotera of his own volition, exercising a contractual right to resign that required the forfeiture of his unvested Units.[261]

The implied covenant "does not apply when the contract addresses the conduct at issue."[262] Roth's Senior Management Agreement gave him the right to resign for "Good Reason" if his duties were materially diminished.[263] He exercised that bargained-for right and received substantial severance.[264] The Restricted Stock Agreement also provided that unvested B-2 Units were forfeited upon a Good

---

[260] Pl.'s Opening Post-trial Br. 60.

[261] It further fails because the premise of Roth's argument—that the B-2 Units were on the verge of vesting—is flawed. As explained above, neither the May 2015 GTCR Fund IX payment nor the 2021 Warburg margin loan constituted a Sponsor Inflow. The Sponsors also did not act in bad faith by navigating the IPO, secondary offering, or block trade according to market conditions rather than the B-2 vesting threshold. Because the Sponsors were well below the 2.5x threshold in the summer of 2022, Sotera lacked a motive to force Roth out to prevent his B-2 Units from vesting. It was not until 2024 that vesting occurred. *See* PTO ¶ 75; JX 771 at 17.

[262] *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 896 (Del. 2015).

[263] Senior Management Agreement § 1(c); *id.* § 4 (defining "Good Reason"); *see also* PTO ¶ 165.

[264] Roth Tr. 76-77.

Reason resignation.[265] The implied covenant cannot be used to rewrite or circumvent these terms.

Further, "Delaware courts are hesitant to recognize the implied covenant in the context of at-will employment."[266] "Dislike, hatred or ill will, alone, cannot be the basis for a cause of action for termination of an at-will employment."[267] To prevail on a constructive termination claim, Roth must prove that his working conditions were made intolerable.[268] He has not made this showing.

Over the course of many years, Roth received fair reviews, which acknowledged his strengths and weaknesses and were consistent with Roth's own self-reviews.[269] When Petras "opened the door to [Roth] possibly leaving the company" in February 2021, Roth testified that the discussions were positive, Petras treated him well, and Petras "was, for the most part, a fair leader[.]"[270] In 2021,

---

[265] Restricted Stock Agreement § 3; *id.* at 14 ¶ 6.

[266] *Jhaveri v. K1 Inv. Mgmt. LLC*, 2025 WL 1779507, at *12-13 (Del. Ch. June 27, 2025); *Pressman*, 679 A.2d at 444 (explaining that such restraint stems from "a concern that the [c]ovenant could thereby swallow the [employment at-will doctrine] and effectively end at-will employment").

[267] *Pressman*, 679 A.2d at 444.

[268] *See Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 832 (Del. 2005) ("To establish a constructive discharge, the plaintiff [must] show 'working conditions so intolerable that a reasonable person would have felt compelled to resign.'" (citation omitted)); *Eastburn v. Del. Dep't of Transp.*, 2009 WL 3290809, at *5 n.7 (Del. Super. Sep. 21, 2009).

[269] *See supra* Section I.G.

[270] Roth Tr. 129-30.

Petras told Roth "we believe the company is better with you on our team than not on our team."[271] Though Petras offered Roth a demotion, the position would have allowed Roth to remain one of Sotera's most highly compensated employees.[272] Roth stayed at Sotera for a year and a half after Petras told him a replacement was being sought for his role.[273]

Roth was understandably upset that he was being demoted and would have to report to his replacement. But such events—even if humiliating—are not "the sort of 'intolerable' working conditions" that show constructive discharge.[274] Roth has not met his burden to prove a breach of the implied covenant of good faith and fair dealing on this basis.

*          *          *

Roth did not prove that Sotera breached the implied covenant of good faith and fair dealing. None of Sotera's or the Sponsor's capital market transactions were driven by bad-faith or an unreasonable desire to keep B-2 Units from vesting. Similarly, the changes to Roth's role that prompted his resignation were not a pretextual scheme to force his departure. The implied covenant cannot be used to rewrite the parties' bargained-for agreements, guarantee unbargained-for benefits,

---

[271] Petras Tr. 177.

[272] *Id.*

[273] *See id.* at 174.

[274] *Jhaveri*, 2025 WL 1779507, at *12-13.

51

or compel a company to undertake commercially disadvantageous actions simply to cause an equity payout to a single executive. Accordingly, judgment on Roth's implied covenant claim is entered in favor of the defendants.[275]

## C. Declaratory Judgment

Roth seeks a declaratory judgment that the Sponsors Inflow Trigger Date occurred and that his B-2 Units vested before his resignation.[276] This claim is duplicative of the breach of contract claim. I have determined that the Sponsors Inflow Trigger Date did not occur, and that Sotera did not breach the governing agreements or the implied covenant of good faith and fair dealing.[277] Roth's request

---

[275] Roth also argues, for the first time in his post-trial briefing, that Sotera breached the implied covenant by using its "superior bargaining power" to impose "draconian trading restrictions" on him shortly before the IPO. Pl.'s Opening Post-trial Br. at 61; *see also id.* at 57-58. Because this theory was not fairly presented before trial, it is arguably waived. *See, e.g., IBP*, 789 A.2d at 62 (explaining that arguments raised for the first time in post-trial briefing are waived). Even if considered, the claim lacks merit. Roth is a sophisticated former investment banker and an accredited investor who negotiated bespoke vesting rights and had counsel review the governing LLC Agreement. *See* Roth Tr. 5-6, 82-85, 98-101; Klaben Dep. 311; Topco Parent LLC Agreement § 11.01(e)(ii). He admitted he was never guaranteed a vesting event. Roth Tr. 20, 92-93. The trading restrictions he complains of were also dictated by the Topco Parent LLC Agreement he assented to years earlier. *See* Topco Parent LLC Agreement § 7.01(c), (e). If anything, the post-IPO transfer restrictions were less burdensome than the indefinite restrictions that applied pre-IPO under the Topco Parent LP Agreement. *See* Klaben Tr. 833; JX 242§ 4.01(a).

[276] Pl.'s Opening Post-trial Br. 62-63 (seeking a declaratory judgment per 10 *Del. C.* § 6501); PTO § V.A ¶ 3.

[277] *See supra* Sections II.A, B.

for a declaratory judgment is meritless for the same reasons; the claims rise and fall together.[278]

## III.    CONCLUSION

For the foregoing reasons, Roth has failed to prove by a preponderance of the evidence that Sotera breached the governing agreements or the implied covenant of good faith and fair dealing.  Roth's related request for a declaratory judgment is also denied.  Because Roth has not established liability on any of his claims, I need not address his request for damages or attorneys' fees.

Judgment is entered in favor of the defendants on all counts.  The parties must confer on and submit a proposed form of final order implementing this decision within 14 days.

---

[278] *See, e.g.*, *PVP Aston, LLC v. U.S. Bank Nat'l Ass'n*, 2023 WL 525059, at *11 (Del. Super. Jan. 24, 2023) (dismissing a declaratory judgment claim "for the same reasons" that the breach of contract claims failed).